## Wesley Truesdail v. Eber B. Ward and others.

*Land contract: Forfeiture: Rights and obligations of vendor and vendee.* A vendee of land, under a written contract, having neglected to comply with its terms, will, after notice of forfeiture for such non-compliance, in order to protect his equities under the contract, be required to exercise frankness and good faith in his subsequent negotiations with the vendor; and if he allow the vendor to suppose that he has acquiesced in the forfeiture, and the vendor in consequence sells the land to another, the vendee's rights under the contract will be terminated.

If a man, either by words or conduct, has intimated that he consents to an act which has been done, and that he will offer no opposition to it, although it could not have been lawfully done without his consent, and he thereby induces others to do that from which they otherwise might have abstained, he cannot question the legality of the act he had so sanctioned, to the prejudice of others who have given faith to his words, or to the fair inference to be drawn from his conduct.

TRUESDAIL v. WARD.

If a party, having a right to property, stand by and see another dealing with the property in a manner inconsistent with that right, and makes no objection while the act is in progress, he cannot afterwards complain.

*Heard November 1 and 4.  Decided November 29.*

Appeal in Chancery from Lapeer Circuit.

The bill in this cause was filed by Wesley Truesdail, in the circuit court for the county of Lapeer, in chancery, against Eber B. Ward, Halmer H. Emmons, Benjamin F Moore, William Moore, and Allender S. Moore for the specific performance of a contract for the purchase of about twenty-five hundred acres of pine lands. The bill was taken as confessed, as against Emmons; the other defendants answered, proofs were taken, and the cause was heard upon pleadings and proofs. The court below dismissed the bill, and the complainant brings the cause to this court by appeal.

*Sidney D. Miller, Samuel T. Douglass, Geo. V. N. Lothrop,* and *C. I. Walker,* for complainant.

*Ashley Pond,* for defendant Ward ; *Maynard & Meddaugh,* for defendants Moore.

GRAVES, J.

On the 23d day of February, 1864, the complainant being interested in a steam saw-mill in St. Clair, entered into a written agreement with defendant Ward, for the purchase of something over four sections of pine land in the county of Lapeer, for forty-four thousand four hundred dollars. By the terms of this agreement complainant was to pay five thousand dollars down, six thousand dollars on the first day of October, 1865, a like sum on the first day of October in each subsequent year to and including 1870, and three thousand four hundred dollars on the first day of October, 1871, together with interest at seven per cent.

from July first, 1864, to be paid annually on the first day of October, on the principal sum unpaid. The first payment of five thousand dollars was duly made on the execution of the contract. On the 10th day of December, 1864, the defendant Ward mortgaged his interest in the land and contract to the defendant Emmons, to secure the payment of sixteen thousand dollars on or before the first day of January, 1870, and annual interest on that sum at seven per cent. By the terms of this mortgage, the mortgagee was authorized to annul the agreement with Truesdail, as "therein specified," and was also authorized to receive to his own use the moneys promised by the contract. About the 12th of December, 1864, Judge Emmons notified complainant of the mortgage, and that all future payments should be made to him. As the first day of October, 1865, approached, the complainant, being without means to pay the principal sum of six thousand dollars then to fall due, obtained from Ward an extension of the time, upon condition that he should pay the accrued interest, and accordingly, upon the 28th of September, he paid to Ward two thousand one hundred and sixty dollars and eighty-five cents, as the share of the latter, and in February following, to Judge Emmons, the sum of nine hundred and ten dollars as his portion. Complainant likewise paid the taxes for the years 1865 and 1866, which amounted to over one thousand two hundred dollars. The complainant failing to make further payments, and having done nothing upon the land, the defendant Ward notified him in writing on the 18th of March, 1867 that he was required to make payment of all sums then past due within thirty days, and that in case of failure, he, Ward, at the expiration of that time should declare the contract forfeited, and the rights of complainant under it at an end. No payments being made in the interval, the first notice was followed by another on the 13th of

May following, in which Ward declared the contract forfeited, and all rights of complainant under it wholly cut off.

Judge Emmons appears to have acquiesced in these proceedings, as also in those subsequently taken with the Moores. This, I think, must necessarily be inferred from all the circumstances as they now appear. After several months, and in September following the notices, a negotiation commenced between Ward and the Moores for a sale to them of the lands before contracted to complainant, which finally ripened into a contract in writing, under date of October 2, 1867. By this agreement the defendant Ward bound himself to convey the land to the Moores for the same price complainant had agreed to pay, namely, forty-four thousand four hundred dollars, of which, however, the sum of eleven thousand one hundred dollars was to be, and actually was, paid in hand. About five and a half months after this contract with the Moores, and over ten months subsequent to the final notice of forfeiture, namely, on the 18th of March, 1868, the complainant tendered to Ward and Emmons the whole remaining purchase price, including interest to the time when the principal, by the terms of the contract, was to be paid, and demanded a conveyance, which was refused; and in May following he filed this bill to compel performance of the contract. Judge Emmons allowed the bill to be taken as confessed, but the other defendants answered, and on hearing upon pleadings and proofs, the circuit court dismissed the bill. The case is now before us upon the merits. The answers, as required, were put in under oath, and the complainant and defendants Ward, Allender S. Moore, and Judge Emmons were examined as witnesses.

The cause has been argued before us with great thoroughness and ability, and several points have been mooted and discussed, which are thought to be immaterial

to a just decision. The amount in controversy is considerable, and the effect of a decree one way or the other must be attended by important consequences to parties. But the circumstance that the pecuniary interests in contest are large cannot unsettle principles. When jurisdiction attaches, the bare magnitude of the matter at stake will neither stay, nor turn aside, the arm of the court. The theory of the case for complainant is, as I understand it, that on a proper interpretation of the contract, time was not of its esssence in the view of a court of equity; that the notices of March and May were inopportune for the purpose of declaring a forfeiture because they were not given in October, and were insufficient to effect their professed object because Emmons was not connected with them, and consequently that those notices had not the effect intrinsically to terminate the rights and interests of complainant; that whatever might have been the effect, by itself, of a refusal on the part of Ward and Emmons, after complainant's default in January, 1867, to consider the contract in force, yet that Ward's treatment of the subject, personally and otherwise, after that time, establishes that the agreement was recognized as subsisting and enuring to complainant's benefit, and that the Moores purchased with notice of complainant's contract, rights, and relations, and therefore made themselves subject to his equities.

Ward and the Moores on the contrary maintain that, as matter of law, time was of the essence of the agreement; that the notices from Ward were sufficient to terminate, and did terminate, complainant's rights and interests under the contract, both at law and in equity; but if not, that the sale to the Moores did so, under the circumstances, and in view of complainant's long continued default; that a correct interpretation of the facts shows that complainant not only concealed from Ward until long

after the latter had become fettered by the contract with the Moores, that he, complainant, had any latent views inconsistent with Ward's avowed position that the contract had been put an end to; but so carried himself in his intercourse and transactions with Ward, as to lead him naturally to think that the forfeiture, which had been declared, was acquiesced in, and that nothing was expected by complainant except what Ward should allow as matter of favor; and lastly, that when the Moores came to conclude their bargain with Ward, they were naturally led to assume from complainant's conduct and from appearances he assisted to produce, that he then had no enforceable rights or interests connected with the property.

We cannot read the contract in question without perceiving that the parties regarded the provisions concerning the time and manner of payment as extremely important, and their subsequent conduct relative to postponements is very persuasive evidence that this part of the agreement was understood to be very material. The arguments for complainant were not apparently directed against this view, but were understood to maintain that the fundamental ground of equitable interference in this class of cases is that of relief against forfeitures, and that consistently with that principle a failure to pay by the day, or within any considerable time afterwards, can never be a bar to relief when the alternative would be a forfeiture, however stringent and expressive the terms of the contract may be in making time essential.

The needs of the case do not require an examination of this argument; nor do they demand an investigation of the correct meaning or limits of the doctrine concerning the essentiality of the time for performance. Neither is it necessary to inquire whether the stipulations in this agreement were such, abstractly and in point of law, as to permit or debar an enforcement in

equity after default upon or without a determinate declaration of forfeiture. The case may be decided upon a different consideration. The conduct of the parties, touching their rights and duties and the continuance and termination of their contract relations, becomes of vital importance, while the merely strict, legal import of the provisions for forfeiture as something separate and apart from a construction adopted by one and apparently accepted by the other party, is, as I conceive, a matter of no moment in this case. The same observation applies to the effect which may have been legally due to the written notices given to complainant. Whether, as matter of law, on a correct reading of the contract, these notices were entitled to be considered as adequate to produce the end insisted on by Ward and denied by complainant, is not the real question. But the point is, whether Ward understood, when he bargained with the Moores, that the agreement with complainant had been deprived of all force, and was clearly authorized by complainant's behavior to infer that he acquiesced, and assented to that view. That the Moores purchased, with notice that complainant had theretofore held the contract in question, is not denied; and I think the weight of evidence favors the opinion that, some little time before they entered into their contract, they were informed that complainant *then* made some claim, but afterwards, and when they concluded their bargain, they were led to believe that he no longer did so.

But whatever view may be taken of their position relative to complainant's equities, the relief here sought can only be obtained by establishing a case against Ward. He made the contract sought to be enforced. The land has not been conveyed by deed to any one, and the right against the Moores is, according to the exigency of the case, made dependent upon the right to a decree against Ward. What has now been stated will suffice to lead to a special exam-

ination of that branch and aspect of the case upon which the issue may, in my judgment, be decided; and this involves the inquiry, whether, in the events which happened and on the facts appearing in the record, the complainant should be considered as having precluded himself from asserting against Ward, in order to insure its enforcement, that the contract is still open, subsisting and obligatory.

The first step in this enquiry is naturally an attention to those parts of the agreement which looked to a termination of complainant's rights and interests on his failure to perform.

This appears expedient in order to ascertain whether there were fair and reasonable grounds for Ward's assumption, that the rights of complainant were liable to be determined at Ward's election in case of default, and also for the purpose of interpreting the conduct of the parties in its bearing upon their belief as to the existence of the right of forfeiture, and upon their views, real or apparent, as to the validity of the forfeiture which Ward assumed and claimed to have been effected.

By the second specific clause of the contract, it was expressly stipulated that the time of payment of instalments should be of the essence of the agreement, and that in case of default in either of the payments, it should be at Ward's option, at any time within thirty days from the default, to declare a forfeiture either by notice given to complainant or to any person found in possession or occupancy of any of the lands, or by written notice deposited in the post-office at Detroit, directed to complainant at that place, and that from the mailing of such notice, the rights of complainant should forever cease, and that Ward should not be bound to refund anything paid.   By that part of the fourth specific clause, relating to payments for logs cut in excess of three million feet per year, it was provided

that if complainant should fail to pay within thirty days after the logs should be sold, then Ward should have the like option to declare the agreement forfeited.

In a subsequent part of the same clause, it was expressly stipulated that if complainant should fail to perform all or any of the agreements therein before specified, such act should be deemed as a surrender of the agreement by him, and that he should thenceforth and forever absolutely forfeit all claim to a deed of said land and every part thereof, and to all improvements made thereon; that Ward should thereupon be wholly relieved, absolved, and discharged from all liability or obligation to make conveyance, or to refund any of the moneys paid, and should be at liberty and have full right to grant, bargain, sell, and convey the premises and every part of them, to any other person or persons, wholly released from all right and interest, claim and demand of complainant therein or thereto the same as if the agreement had not been made ; that if complainant should be or remain in possession or occupancy of any portion of the lands after his violation of the agreement, or after *default* in the *payment* of the specified amounts, at maturity, he should be deemed a trespasser and be put out either with or without process, and that no notice to complainant should be necessary before entry or sale by Ward.

These stipulations were deliberately made and entered into by competent and intelligent parties, without mistake, imposition or fraud, and their object was sufficiently palpable to make misapprehension impossible. They must have been understood as designed to give Ward an option to oust complainant from every right and benefit of the contract, in case the latter should make any substantial default in payment.

It was consequently natural for Ward to assume that he

could lawfully declare a forfeiture upon any such default; and after the delays and failures which preceded the March and May notices, it was reasonable for him to consider that the contingency had occurred upon which a declaration of forfeiture would be valid; and when those notices were in fact given, he was fairly entitled, in view of the terms of the agreement and their manifest object, and in the absence of any pretension from any one to the contrary, to suppose they were fully adequate to cut off all legal rights of complainant.

In reference however to these proceedings to terminate his rights, the complainant asserts that, immediately after they occurred, he called upon Ward and was by him told that he need not be uneasy, as it was not designed to deprive him of the benefits secured by the contract, but was only meant to place him, Ward, in a situation in which he might legally prosecute trespassers upon the lands; and that thenceforward and until October after, when the Moores obtained their contract, matters relating to the land were continuously agitated by Ward, in person and by agent, with complainant, and on the footing that complainant was still to enjoy the benefits of the contract.

While fully conceding that, during the interval, conversations were often had with complainant in relation to the lands and timber, and efforts made to realize from the property, the defendant Ward gives a very different complexion to these affairs. He explicitly denies the statement imputed to him on the declaration of forfeiture, to the effect that complainant need not be uneasy and that the real object was to secure the right to prosecute trespassers and not to deprive the complainant of the benefits of the contract; and he insists that he always stood upon the forfeiture he considered to have been established, and that complainant, during such period, never pretended to him or to any other

person, to his knowledge, that the forfeiture was not lawfully complete; that he was anxious to dispose of the lands at the earliest moment, and meant to do so, as he informed complainant; but from a desire that complainant might escape loss, he, Ward, was willing that he, complainant, should open the way to some satisfactory disposition of the lands, if practicable, before he, Ward, should find a buyer, and by means of such mere voluntary favor, retrieve the losses occasioned by his default; that nothing respecting the disposal of the lands, that occurred after the forfeiture was declared, with his, Ward's, knowledge and approbation, was *intended*, or understood by complainant as intended, to give any color for the claim now advanced.

It will readily appear that complainant can derive no aid from his version of what occurred at the interview immediately after the May notice, because the matter rests upon the statements of himself and Ward, and the parties are completely at variance as to the making of such of the declarations ascribed to Ward as go to support the complainant's position.

It is next to be seen with which theory the transactions that occurred after the declaration of forfeiture and before the sale to the Moores, can be best reconciled in the light of such of the surrounding circumstances as appear to be proved; and without going into an elaborate criticism or making extracts from the exhibits, it will suffice to say that the transactions in question, in so far as Ward seems to have been implicated in them, do not appear to harmonize with the theory that the contract was still regarded as intact or obligatory in any sense upon Ward; but on the contrary, when taken in their entirety, and examined in the light shed by Bean's testimony, they point to arrangements and dealings quite incompatible with the prevalence of the terms of the agreement.

It is important to notice that, during all this time, and until long after the agreement with the Moores, the complainant was acting upon a legal view which he studiously withheld from Ward. He had taken legal advice as to whether, as matter of law, on a critical wording of the contract, the notices of March and May were adequate to produce a forfeiture, and had been informed that they were not. This circumstance he carefully kept to himself, and at the same time allowed Ward to proceed upon the notion that the operation of the contract as to the right and course of forfeiture were what the parties must have supposed it to be when the agreement was signed.

This fact of itself is very expressive, and shows pretty clearly that the minds of the parties were not working in the same groove ; and surely we ought not to judge of Ward's conduct by a fact known to complainant, and which, to enable him to gain an advantage through these varied and dilatory operations, he carefully concealed from Ward. On the contrary, this course of complainant, in connection with the attitude of the parties as now seen, should incline us to put a favorable construction upon Ward's acts.

Upon a fair view of this branch of the case, there is reason for holding that the facts accord more with Ward's theory than with that of complainant.

The next step leads to the events immediately connected with the sale to the Moores, in so far as these events bear upon complainant's equitable right to insist that his contract remains open and enforcible against Ward. In reference to this point, it is material to bring under view the testimony given in relation to the incidents and occurrences connected with that sale. The complainant, on his direct examination, testifies in substance, that after returning from St. Clair, on the 30th of September, he called at Ward's office on the 1st of October, when he was informed

of the agreement to sell to the Moores; that he then told Ward he was taken entirely by surprise, and that the negotiations which had been going on had put him to sleep, and that he desired an extension of ten or fifteen days; that he then offered Ward and Moore one thousand dollars if they would give him that time to make further efforts to raise money, and that Ward replied that he had no objection if Moore was willing; that Ward then proposed to arrange an interview between complainant and Moore for the next day, and that an interview did occur between them at that time, at Ward's office; that when Moore and complainant came together at that time, Ward retired, and complainant and Moore proceeded to converse respecting the sale of complainant's mill to Moore, and the obtainment of the further time asked of Ward; that complainant then offered Moore one thousand dollars if he would defer the consummation of his agreement for not exceeding fifteen days; that Moore refused to do so, and *gave as a reason, that he was to commence operations immediately for winter work on the land ;* that complainant then urged him to buy the saw-mill, and offered to let it go for twenty-five thousand dollars, which was considerably less than he had before offered to sell it for, and in reference to which offer Moore replied that they should probably want it; that on the 2d or 3d of October, and before the contract had been signed, as he was informed, he, complainant, again met Ward when no one else was present, and urged him to grant the extension of ten or fifteen days, which Ward declined to do; that complainant then told Ward that *his own lawyer would tell him that his, complainant's, rights in the contract, were feasible and tangible, and that he, complainant, would never abandon them, and that he, Ward, would get his money from him, complainant, long before he would from the Moores;* that complainant

24 MICH.—17.

then left the office. He also states that he has no recollection that anything occurred after this time, between himself and Ward and Emmons until the 18th of March, 1868. On his cross-examination he says, in substance, that the conversation in which the meeting with Moore was arranged, occurred on the first of October, and was between himself, Ward and Bean, and that none of the conversation he here relates occurred between himself and Ward and Moore, or when the three were present; that when the conversation occurred in which he told Ward that his rights were "feasible and tangible," himself and Ward were alone in Ward's office.

The defendant Ward testifies in relation to this subject, in effect, that complainant entered the office while the papers with Moore were being made out, and appeared to be anxious to have the Moores purchase the saw-mill, and that complainant's talk chiefly related to that subject; that complainant said nothing whatever about having any rights in the land, and so far from making any objection to the sale then being consummated, he rather intimated that it was a pretty good purchase for the Moores; that complainant was informed of the negotiations with the Moores at the outset, and made no objections whatever thereto; that about the time the contract was being finished, complainant said he would give one thousand dollars for ten days, and he, Ward, was not opposed to the acceptance of the offer; but Moore said he was in a hurry to get ready for winter operations and could not afford to wait; that he, Ward, regarded the contract with complainant as invalid and of no account, and complainant made no remonstrance against the sale to the Moores. He also testifies that nothing was said by complainant in any of these interviews about his having been put to sleep by negotiations, and that between the notice of May, 1867, and the 18th of March, 1868, the

complainant never said any thing to him, Ward, about having any interest in the land; and he explicitly denies that complainant made to him the declaration stated in complainant's deposition, as to the feasibility and tangibility of complainant's rights, and the purpose of complainant not to abandon them.

The deposition of Allender S. Moore in relation to the same matter, is in substance, that on the occasion when the contract with the Moores was concluded, the complainant, so far as he, Moore, heard or knew, made no claim of any right or interest in the land; that complainant seemed to be anxious to have his mill go with the land, and that a conversation, at Ward's request and in his presence, occurred between complainant and him, Moore, touching the disposition of the mill, and that complainant then said that all the dissatisfaction he felt about the matter was, that Ward had promised him that when he sold the land he would sell the mill with it; that complainant offered one thousand dollars to have the contract with him, Moore, left open for ten days, which was declined. According to Bean's evidence, complainant never intimated to him after the declaration of forfeiture that he, complainant, had any rights whatever under the contract; that he, Bean, informed complainant about the time he went to St. Clair, in September, that the Moores had agreed to take the land if they could raise the money, and that complainant neither interposed any claim nor raised any objection; that he, Bean, did not hear the conversation between complainant and Ward, or complainant and Moore, on the occasion of closing the bargain with the Moores.

Eugene Smith, who accompanied Moore to Ward's on this occasion, swears that he heard nothing pass between complainant and Ward.

It does not appear from the record that any other person had opportunity to see or hear what occurred between the parties on this occasion.

Upon examination of this evidence it will be seen that whatever matters are set forth, which were of a nature to indicate to Ward, in his position and with his information, that complainant had sinister or hostile views, or harbored any doubt as to the validity of the forfeiture of his claims, are completely antagonized by denials and counter statements of at least equal weight; and a further examination will show that the matters so met and opposed come short of being corroborated by the other circumstances in the case. These matters should, therefore, be laid aside and not be allowed to influence the result.

There is no doubt, I think, that Ward and Moore, in their action upon complainant's proposition to transfer the mill to the Moores, resorted to a piece of *finesse* which is chiefly noticeable for its want of candor, and for the inference to which appearances lead, that it was meant to give complainant a fictitious ground for hope that, after his losses on account of the land, the mill would not be left upon his hands.

But no admissible complexion can be given to this circumstance which will weaken the inference to be drawn from complainant's effort at this juncture, to have the mill go with the land; that he strenuously urged this, and even went so far as to propose that the Moores, when buying the land of Ward, should take the mill of him at a price several thousand dollars less than he had ever before offered to take, is a fact which he not only admits, but makes prominent and emphatic. Yet it is quite apparent that if Moore had consented to take the mill from complainant when he purchased the land of Ward, the land would have been sold none the less

in disregard of all contract rights of complainant, and none the less in accordance with Ward's idea that the forfeiture was complete.

Being fully aware that Ward was selling the land as his own, upon the assumption that he had the right to do so, the endeavor of complainant to get the purchaser to agree to take his mill also, even at a reduced price, made it natural and reasonable to infer that he did not dispute Ward's right to sell the land separately, and was a fact very persuasive in its tendency to assure Ward and Moore that complainant did not regard himself as invested with any legal interest, or in a situation to deny Ward's competency to sell.

The offer of money for delay was adapted to produce the same impression on Ward and Moore, in the situation they occupied. In order to see this in its true light, it is needful to recall the circumstance already mentioned, that complainant held an opinion in secret, of which Ward and Moore had no hint, that a declaration of forfeiture was not valid if given after October, but probably would be valid if given in that month. From this it will be evident that complainant was likely to regard the declaration before given as inadequate, and at the same time to conclude that a valid forfeiture could be declared at the very time in question, and probably would be, if any doubt should be cast upon the validity of the first. His position and ideas then, made it for his interest to procure delay, if practicable, from time to time without, however, betraying any doubt to Ward of the legality of the declaration of forfeiture which had been given.

From the position of Ward and Moore, the offer to *purchase* time was a concession by complainant that he had no *legal* right to intervene, and that he would be entitled to *delay* only upon the condition of *buying* it. The impli-

cation was very strong that he considered that he could gain nothing except from voluntary concession, or by paying anew for it. On an examination of the whole matter, I think it should be held that complainant so carried himself as to lead both Ward and Moore to believe, and act upon the belief, that he acquiesced in the act of forfeiture, in the sense of its being a legal bar to any claim in this court for execution of the contract. The case appears to me to be within the principle established by a great number of cases of high authority, and founded in the clearest justice. The doctrine was lately laid down in the House of Lords in these words: " It is a universal law that if a man, either by words or by *conduct,* has intimated that he consents to an act which has been done, and that he will offer no opposition to it, although it could not have been lawfully done without his consent, and he thereby induces others to do that from which they otherwise might have abstained, he cannot question the legality of the act he had so sanctioned, to the prejudice of those who have so given faith to his words, or to the fair inference to be drawn from his conduct."—*Cairncross v. Lorimer, 7 Jur., N. S., 149.* Again, in *Nicholson v. Hooper,* Lord Cottenham said: "A party claiming a title in himself, but privy to the fact of another dealing with the property as his own, will not be permitted to assert his own title against a title created by such other person, although he derives no benefit from the transaction."—*4 Myl. and C., 179,* and in *Duke of Leeds v. Earl of Amherst,* the same judge said: "If a party, having a right, stands by and sees another dealing with the property in a manner inconsistent with that right, and makes no objection while the act is in progress, he cannot afterwards complain."—*2 Phillips, 117.* The same ideas are enunciated in various forms by many authorities, both English and American. Among others, see *Gregg v. Von*

*Phul, 1 Wall., 274; Swain v. Seamens, 9 Wall., 254; Skinner v. Dayton, 19 Johns., 513, 561; Raw v. Pote, 2 Vernon, 239; Thompson v. Blanchard, 4 Comstock, 303; Parrott v. Palmer, 3 Myl. and K., 632; Shafer v. Niver, 9 Mich., 253; Calkins v. The State, 13 Wis., 389.* There is nothing in this case to take it out of the clear principle which runs through these and kindred decisions.

But there is another circumstance not undeserving of notice. It appears. that when complainant offered money for delay he was distinctly informed that the Moores intended to proceed immediately to make large outlays upon the land, and according to the evidence, which is not impugned, they actually cut over one million feet of logs before the 18th of March, when the complainant made the tender; and yet the complainant admits that. nothing occurred between himself and Ward and Emmons in regard to the contract, between the time he was so notified that the Moores were going to work on the land, and the 18th of March. This silence of complainant during these five months, when he knew, or had reason to believe, that the interests of the parties were being largely implicated, and that the changes taking place on the footing of the invalidity of any claim by him must necessarily entail great losses on Ward or the Moores, or both, in case his pretensions should prevail, not only bear against him upon the point before . considered, but is likewise a circumstance to show that he did not use that diligence and good faith which his position called for and equity requires.—*Hatch v. Cobb, 4 Johns. Ch., 560.*

It was said at the bar that the pleading and evidence of some of the parties were plainly repugnant or contradictory in material particulars, and it was strongly argued that this was sufficient to discredit the evidence of such parties. But I think it appears, on a careful examination of the

record, that many of these supposed discrepancies are more apparent than real, and that where this is not the case, both sides are exposed to criticism on this and similar grounds.    These difficulties in the case are not sufficiently serious to make our decision turn upon them.

I am of opinion that the decree below should be affirmed, with costs.

The other Justices concurred.