JOHN C. GRAM v. GEORGE E. WASEY ET AL.

| 45 | 223 |
|----|-----|
| 71 | 680 |
| 45 | 223 |
| 74 | 514 |
| 45 | 223 |
| 89 | 7 |
| 45 | 223 |
| 111 | 574 |
| 45 | 223 |
| 112 | 323 |
| 45 | 223 |
| f122 | 489 |

*Extension of time for settling case—Signing transcript nunc pro tunc—When time is essential in a contract—Acquiescence in forfeiture—Costs.*

The Supreme Court will extend the time for settling a case in which the proofs were taken in open court, if the failure to settle it within the prescribed time could not have been prevented by the appellant.

Where return has been made to a chancery appeal, the Supreme Court having obtained jurisdiction, will give opportunity to make good such defects as were not due to appellant's negligence; and if the transcript has not been signed, it will allow the filing of a certificate from the trial judge that the case was settled and the proofs are correct.

A contract for the sale of timbered land required the purchaser to pay current and back taxes, and an instalment of the price, annually, but stipulated against waste. Time was made essential, and the contract was subject to forfeiture on default. The purchaser did not pay the taxes, but within the first year cut a large quantity of pine which he sold, besides selling a parcel of the land on time. The vendors also, within the year, sold their interest to W., who went on the land and began to lumber it without any objection from the original contract purchaser, who did not make any offer of payment, but some time afterwards assigned all his rights to G., who had full knowledge of the facts. G. then filed a bill against W. to restrain him from exercising acts of ownership. *Held* that the bill could not be maintained and that complainant must be held responsible for all the expenses incident to the litigation, including charges to which the suit gave rise against lumber cut by W., who could include such charges in his costs.

In Michigan time is not usually so far of the essence of a contract that failure to perform within the time fixed will necessarily forfeit it; but when a vendee fails to perform his obligations relief is not a matter of right and will not be granted if, under all the circumstances, including the conduct of the parties, it does not seem just and reasonable.

Equity relieves against forfeiture, when it would be oppressive or fraudulent not to.

Contemporary parol agreements cannot be set up in violation of express written contracts.

Appeal from Alcona. Submitted Nov. 10. Decided Jan. 12.

Motion to remand the record to obtain the judge's certificate of settlement. Submitted October 19, 1880. Decided October 26, 1880.

*Beakes & Cutcheon* for the motion.

MARSTON, C. J. Where proofs have been taken in open court in a chancery cause, an appeal taken, and an effort made to have the case settled under and within the time fixed by the statute, but which failed or was imperfectly done from circumstances not caused by or within the control of the appellant, such as the failure of a stenographer to furnish a copy of the testimony, or of the Circuit Judge to properly settle or certify to the same, the appellant may in this Court have an order extending the time to perfect his appeal, or if return has been made, the proper certificate may be obtained from the Circuit Judge and filed with the record, that the case was settled and that the proofs returned are correct. In such cases this court having obtained jurisdiction of the cause, an opportunity will be afforded the appellant to correct such defects as were not caused solely by his own negligence.

The other Justices concurred.

---

INJUNCTION, accounting, etc. Defendant appeals. Reversed.

*Hatch & Cooley* for complainant. Strong equities must be shown before a court will refuse to enforce a written contract for the conveyance of land: *Rogers v. Odell* 36 Mich. 411; *Fitzhugh v. Maxwell* 34 Mich. 138; a court of equity has no jurisdiction to enforce forfeitures: *Hall v. Delaplaine* 5 Wis. 215; time is not usually of the essence of a contract: *Wallace v. Pidge* 4 Mich. 570; *Bomier v. Caldwell* 8 Mich. 463; *Morris v. Hoyt* 11 Mich. 9; *Richmond v. Robinson* 12 Mich. 193; *Converse v. Blumrich* 14 Mich. 109; *Shafer v. Niver* 9 Mich. 257; notice of default should give reasonable time for performance: *Hogsett v. Ellis* 17 Mich. 351; the vendee in a land contract is a tenant at will: *Dwight v. Cutler* 3 Mich. 566; *Crane v. O'Reiley* 8 Mich. 312.

*R. Z. Roberts* and *Beakes & Cutcheon* for defendants. It is lawful to make time of the essence of the contract, and agree that if a vendee does not pay at the time specified the vendor's obligation to sell shall be terminated : *Benedict v. Lynch* 1 Johns. Ch. 375 ; *Lloyd v. Collett* 4 Brown Ch. 469 : 14 Ves. 430 ; *Webb v. Hughes* L. R. 10 Eq. 284 ; *Boehm v. Wood* 1 Jacob & Walker 420 ; *Williams v. Edwards* 2 Sim. 83 ; *Alley v. Deschamps* 13 Ves. 225 ; *Hunter v. Daniel* 4 Hare 423 ; *Parkin v. Thorold* 2 Sim. N. S. 1 : 16 Beav. 59 ; *Wells v. Smith* 7 Paige 22 ; *Domnick v. Michael* 4 Sandf. Sup'r Ct. 374 ; *Kirby v. Harrison* 2 Ohio St. 332 ; *Heckard v. Sayre* 34 Ill. 150 ; *Stow v. Russell* 36 Ill. 33 ; *Ahl v. Johnson* 20 How. 521 ; *Hansbrough v. Peck* 5 Wall. 505 ; *Grigg v. Landis* 4 C. E. Green 350 ; *Reynolds v. Nelson*, 6 Madd. 20 ; 3 Pars. Cont. 383 ; Adams' Eq. (4th Am. ed.) 254; 1 Sugd. Vend. 444.

CAMPBELL, J. This is a bill in the nature of a bill for specific performance, to restrain vendors from exercising acts of ownership over certain lands which had been contracted for sale, and on which they had re-entered after the vendee's default.

The original contract was made October 14, 1878, between two tenants in common, each named George W. Moore, residing in Detroit, and Robert Goodfellow. The lands sold were in Oscoda county, and consisted of nine parcels in town 26 North, of range three East, containing in all 1480 acres, and lying in one tract. The terms of sale were that the purchaser should pay $1108, of which eight dollars were paid down, the remaining $1100 to be paid in yearly instalments of $100, with seven per cent interest on the whole principal, payable October 17th of each year. The purchaser was to pay up all taxes then unpaid, and to pay all future taxes of every kind, the past-due taxes being applicable on the last instalments of purchase money. Goodfellow was by the contract to be let into possession and remain so long as he fulfilled it, and no longer, but was restricted from committing

any waste beyond cutting fire-wood or other wood for his own use, or while clearing for cultivation.

The contract was subject to be terminated by any default or violation of its terms, and time was declared to be of the essence of the agreement, and, unless in all respects complied with, the vendee was to lose all claims under it.

Goodfellow paid down the eight dollars referred to, and went at once into possession, built a log house and made a small clearing about it. He undertook to sell a parcel of 160 acres to one Coursier on five years' time, and Coursier also went into possession and built a log house on his tract. Goodfellow paid no taxes, either old or current, and during the winter after he entered cut 104,000 feet of Norway and white pine which he sold to complainant for something over $300, aside from running expenses. During the summer or early fall of 1879 Moore & Moore sold out to Wasey their lands in three adjoining townships in Oscoda, including the lands contracted to Goodfellow. On the 18th of October, 1879, Wasey with the concurrence of Moore & Moore (who had told him when he purchased that they understood Goodfellow did not intend to carry out his contract) prepared a notice to terminate the agreement and quit the premises, and sent it up to be served on Goodfellow if he failed to perform. The notice was served October 23d, on Goodfellow in person on the premises, and Wasey's men in a few days went on the lands, established their lumber camps and went to lumbering, and had cut about a million and a half feet, being the principal part of the pine lumber of all sorts, before this bill was filed.

Goodfellow made no protest or resistance, and made no offer of payment. At the end of December he entered into negotiations with complainant and executed an assignment which did not cover the timber cut by Wasey and his associates. The testimony tends to indicate that this arrangement was for an interest on shares. On the 23d of January, 1880, an absolute assignment of everything was made for the expressed consideration of $300, and the testimony indicates

that this was subsequently satisfied by various payments and dealings.

Gram filed his bill in this cause on the 26th of January, 1880, and obtained an injunction against cutting more timber or disposing of that already cut. Under a subsequent modification the timber cut was boomed in the Au Sable river. The case was heard on proofs taken in open court, May 5, 1880, when the Circuit Court for the county of Oscoda decreed in favor of complainant authorizing a receiver to sell the logs, and dispose of the proceeds in the following manner: *First*, to pay boom charges and receiver's expenses with $5 a day as compensation for his services; *second*, to pay defendants $4.40 a thousand as their actual outlay in getting the timber out and taking it to where it would go forward to market; *third*, to pay defendants what was due on the contract, not however declaring how much was so to be paid; *fourth*, to reserve $1500 to be held to secure future instalments as they should come due; *fifth*, to pay the balance to the complainant.

This order included two million of feet. Defendants claim, and we think they are borne out by the proof, that all the logs beyond 1,500,000 feet were cut from other lands.

From this decree defendants appealed, and claim that complainant made out no case for relief whatever. It is claimed not only that no case was made out by proofs, but that the bill itself does not state the case either fully or truly. It is necessary in the first place to look at the bill.

The contract as set forth in the bill makes no reference to any of the clauses and conditions which forbade the commission of waste, and left out also all the default clauses. It sets out the payment of eight dollars down, and avers that Goodfellow entered the lands and built a house, barns and outbuildings, and made other valuable and permanent improvements, and occupied with his family.

The bill sets out the notice given by Wasey as in pursuance of a previous purchase made with intent to defraud Goodfellow, and avers that the defendants, being in business under the name of the Oscoda Salt & Lumber Company, immediately entered on the land about October 20, 1879, and have

ever since been lumbering there and have cut off pine and other lumber; that the land without the timber is worth $3000 and the pine was worth from $7000 to $9000.

That on December 31, 1879, Goodfellow sold to complainant all his rights in the land and lumber for $300, and that on the 23d of January, 1880, he paid that sum to Goodfellow.

That January 8, 1880, he paid all the unpaid taxes amounting to $241.60, and that on the 13th day of January he tendered Wasey $180, being the whole amount then due, but Wasey refused to accept it. The bill offers to pay any moneys due or to become due thereafter.

The answer relies on Goodfellow's violation of the contract in various ways, including his cutting and selling lumber, his sale to Coursier, his failure to pay taxes outstanding, and his failure to pay the October instalment, and their understanding, when Wasey bought, that he had wrongfully cut timber, and did not expect to fulfill.

The refusal to accept tender is admitted, but the payment of taxes is denied, and complainant is left to his proof concerning the assignment, but they deny that he paid the consideration.

The answer claims the bill makes out no cause of action, and insists on the benefit of a demurrer. No amendment was ever made to the bill.

As the bill makes no averment that Goodfellow had performed any part of the contract beyond the preliminary payment of eight dollars, and makes no excuse for his non-performance, and contains no averment that he ever meant or desired to perform it, it rests on the theory that his rights were of such a nature that they were not imperilled by any default in the execution of the conditions. It does not set out the conditions of forfeiture or against waste at all, and therefore gives no explanation or excuse for that. This last matter of course does not affect the bill as demurrable, but it bears on the effect of some proof on which reliance is placed.

It has been held in this State that time is not generally so far of the essence of a contract that a failure to perform

within a period specified will necessarily preclude a party from being allowed to perform subsequently. *Richmond v. Robinson* 12 Mich. 193.

But on the other hand, when a vendee has failed to perform his obligations, relief is not a matter of right, and while unimportant omissions may be disregarded, relief will not be granted when, under all the circumstances, including the conduct of the parties, it does not appear just and reasonable. The ground on which equity relieves against forfeitures is that it would operate oppressively or fraudulently to refuse. But no one can ask relief to which he has lost his strict right when his own conduct renders it unjust that he should have it. *Smith v. Lawrence* 15 Mich. 499 ; *Truesdail v. Ward* 24 Mich. 117 ; *Hawley v. Jelly* 25 Mich. 94.

In the present case no more was paid down than a merely nominal sum, which would not more than pay the preliminary expenses of the bargain. The land at that time had been sold for taxes and bid in by the State for the taxes of several different years, to an amount, with interest to that time, of probably in the neighborhood of one hundred and seventy-five dollars, having been more than two hundred in January, 1880. Any person could buy up these titles and obtain conveyances presumptively valid and possibly valid in fact. These tax encumbrances made a part of the consideration of the contract, and the amount paid on them was to be allowed on the last payments under the contract. The contract price drew only seven per cent. interest, whereas interest was running on the State bids at the rate, in some instances, of fifty per cent., and in all cases of much more than seven per cent. The agreement to pay these taxes was one which may fairly be regarded as intended in lieu of any large payment down, and required performance within a reasonable time, which could not be a long time without subjecting the vendors to the double risk of having their purchase money largely reduced, and having their security put in peril.

The chief, and as was supposed, nearly the only value of the land was in the Norway pine, which had not been

stripped, and the small amount of other timber remaining on the premises. The purchase price being a very low one is in accordance with all the proofs concerning the elements of value. The contract expressly prohibited any waste, and the nature as well as large extent of the lands indicated that the purchaser could not have expected to pay for the land out of his earnings on it. It appears that in fact he had other means of employment, and did not rely on farming or the ordinary resources of clearing land outside of valuable timber. The contract expressly made time of its essence, and both from the running of taxes which the vendors did not desire to be compelled to pay themselves, and the danger of fire which the complainant lays some stress upon in the testimony on his part, such a provision was not necessarily so unreasonable that circumstances might not authorize the court to pay some regard to it.

When Goodfellow received notice of the termination of the contract at the end of the year, he had made no improvements which had cost much time or much money. The only buildings he put up were the log buildings which every settler in the woods finds it easy to finish in a very short time, and such as any tenant would readily complete for his occupancy. They were not such as would add materially to the value of the whole tract or of any part of it. In the meantime, in direct violation of the agreement he had committed waste by cutting off more than a hundred thousand feet of the best timber for which he received in cash enough to pay the taxes and a considerable share of the first annual payment. He was therefore at the end of the year not only in default for the payment then due (which standing alone and apart from the other conditions might not be very important), but also for the payment of taxes and for the actual misconduct of cutting timber, whereby the value of the land had been directly impaired. He had paid nothing whatever beyond eight dollars for the benefit of his year's occupancy, and he had received three hundred dollars from sales of timber, and while he had paid taxes on his personal property, he had paid none whatever, either current or back taxes, on the land.

There is some testimony from him that at the time he made the contract Moore & Moore gave him permission to cut timber. No such permission was set up by way of amendment to the bill, although the answer relied on the violation of the agreement not to cut. As the testimony was taken in open court and defendants had not been notified of this claim, there was no opportunity to meet this testimony by examining the vendors. But we do not think this evidence is either admissible or reliable for the purpose for which it was put in. A contemporary parol agreement cannot be set up in variation of the express writing, and the bill was filed to enforce the writing and not any change from it. If such permission was given it was plenary, and it is impossible to suppose the vendors would allow the land to be stripped of all that made it valuable, when they had received no payment, and retained no control over the lumber which might be cut. We do not think we can assume that such permission was granted. And we think that if granted, as complainant claims, to enable Goodfellow to meet his payments, it would seriously aggravate his default in not making them.

We do not think that Goodfellow had made any *bona fide* preparation to comply with his agreement. His testimony on this head is somewhat contradictory, but there is nothing that satisfies us he had any reasonable assurance of money, or had made any proper effort to get it. And it is not claimed he expected to raise, if he could, any more than the first annual instalment. The taxes he left without any attention. When defendants warned him of their termination of the agreement, he made no claim that he had adverse rights, and he allowed them without objection to form their lumber camps and make all their preparations; and until a large portion of the land was cleared off they received no hint from any one that they were regarded as intruders. They had a right, therefore, to make all their business arrangements with this understanding, and with the expectation that they could deal with the lumber as they should see fit. If the case were more doubtful than it is, this course of Goodfellow should

estop him, because it is impossible to reckon by the mere expense of cutting and running logs the damage done to par_ ties who have based business calculations on the ownership of the property lumbered.

Complainant can have no better claim than Goodfellow. When he purchased of the latter, it was in full view of the facts, and of the nature of the litigation that must arise. Defendants perhaps are not interested very directly in quesۦions of consideration between him and Goodfellow, but they have a right to have the real parties impleaded. There is little if any doubt that the first arrangement with Goodfellow was champertous. The testimony does not show the second assignment to have been so, but it does not explain Goodfellow's continued possession of his dwelling. The bill avers distinctly and under oath that the consideration of $300, which was a very small portion of the alleged value of the land and lumber, was paid before suit commenced. This is clearly disproved. It also appears distinctly that complainant's tender to defendants was made before the last assignment, and did not include any discharge of taxes.

The bill also avers payment of all back taxes. The proof shows that instead of paying them before the bill was filed most of them were not paid at all, but complainant bought up the State titles more than two months after the bill was filed ; and the taxes on which no sales were made were not paid until March, 1880. The carelessness of such averments under oath, especially as they were conditions precedent to any relief, renders the testimony on other points subject to some scrutiny in matters of doubt.

It appears then that complainant himself had not, when the bill was filed, put himself in a condition to seek relief. Defendants were not bound to accept the annual payment until they were secured against the taxes.

Upon the whole record we think complainant has shown no equities. Goodfellow's failure was in a most serious matter affecting defendant's security. He had committed waste to a considerable amount and thus injured the land. He acquiesced in the re-entry and they incurred risks and liabili-

ties and spent money on the faith of it.   He never notified them of his purpose to contest their doings, and their first knowledge came from an assignee who had acquired no personal equities and who had none on any theory when the bill was filed.

We think the contract was terminated in October, 1879, and that defendants are rightly in possession.   The decree must be reversed with costs of both courts and the bill dismissed.   The lumber, or its proceeds if sold, must be returned to defendants clear of any charges created by this suit, and any such charges actually incurred and paid by them must be included in their costs.   Complainant must be held responsible for all the expenses incident to the litigation.

GRAVES, J., concurred.

MARSTON, C. J., concurring.   I concur in the result arrived at in this case by my brother Campbell upon the ground that Goodfellow acquiesced in the possession taken and cutting of the timber by defendants, and thus in effect abandoned the contract and his rights thereunder.   He certainly, if he wished to insist upon his rights, could have acted much more promptly and at least made some protest.

I do not think that the small amount paid down or the character of the improvements made should have any particular weight in this case.   To Goodfellow these may have been of considerable importance, and the small payment and inprovements of a settler in a new part of the country may not be measured by the same rule that would be applied to those of more pecuniary ability.

COOLEY J. did not sit in this case.