### SMITH *v.* O'DELL.

1. VENDOR AND PURCHASER—MORTGAGES—FORECLOSURE—POSSESSION —NOTICE TO STRANGER.

   In a suit to set aside a mortgage foreclosure on the ground that plaintiff has an equitable interest in the property by reason of an unrecorded land contract thereon from the mortgagors which was never forfeited, although he claims to have been in possession, evidence *held*, insufficient to show that he had such actual possession as would give any notice to a stranger of his rights, even if he had constructive possession before his default.

2. ESTOPPEL—PARTY WHO STANDS BY AND SEES HIS RIGHTS INVADED WITHOUT OBJECTION MAY NOT SUBSEQUENTLY COMPLAIN.

   A party who, having a right to property, sees another dealing with it inconsistent with that right and stands by without making objection while such acts are in progress, may not subsequently complain.

[1]Vendor and Purchaser, 39 Cyc. pp. 1748, 1756; [2]Estoppel, 21 C. J. § 166; 48 L. R. A. (N. S.) 772; 10 R. C. L. 693; 2 R. C. L. Supp. 1042; 4 R. C. L. Supp. 672; 5 R. C. L. Supp. 564; 6 R. C. L. Supp. 617.

3. VENDOR AND PURCHASER—LACHES—EQUITY.

> Where a purchaser under an unrecorded land contract became in default after making two monthly payments, and for nearly a year and a half the building begun for him on the premises by his vendors, who subsequently mortgaged it, stood unfinished, when the mortgagee, after foreclosure and expiration of the redemption period, without notice of the purchaser's claimed interest therein, took possession, paid up back taxes, liens, etc., and completed the building without the purchaser's taking any action to assert his rights, although he claims to have visited the premises two or three times a week, and, if so, must have seen that work was being done thereon, he was guilty of such negligence and laches as to divest his claim of any equitable standing as against the mortgagee.

4. SPECIFIC PERFORMANCE—NOT A MATTER OF RIGHT—DEFAULT—LAND CONTRACTS.

> Specific performance is not a clear matter of right to a defaulting party who has failed to perform his obligations under a contract of purchase.

5. VENDOR AND PURCHASER—VENDEE IN DEFAULT MAY NOT QUESTION VALIDITY OF MORTGAGE FORECLOSURE WHERE VENDORS NOT PARTIES.

> A purchaser under a land contract who has defaulted may not assert any rights thereunder in a suit to set aside the foreclosure of a mortgage given by his vendors, on the ground that the foreclosure by advertisement is invalid, where his vendors are not parties to the suit, since his right to specifically enforce his contract, he being in default, is an open question, to be determined by an adversary proceeding between them.

6. MORTGAGES — FORECLOSURE — PRAYER TO REDEEM BUT IDLE GESTURE WHERE NO TENDER OR OFFER TO REDEEM MADE.

> Plaintiff's prayer for right to redeem from a mortgage foreclosure is but an idle gesture, where he makes no tender or offer to redeem, and gives no assurance to the court that he would or could do so if granted that right.

Appeal from Wayne; Collingwood (Charles B.), J.,

---

[3]Vendor and Purchaser, 39 Cyc. p. 1752; [4]Specific Performances, 36 Cyc. p. 693; [5]Mortgages, 41 C. J. § 1340 (Anno); [6]Id., 27 Cyc. p. 1830.

presiding.    Submitted October 6, 1926.    (Docket No. 15.)    Decided October 3, 1927.

Bill by John Smith against Fred A. O'Dell to set aside a mortgage foreclosure.    From a decree dismissing the bill, plaintiff appeals.    Affirmed.

*Benjamin, Beckenstein, Wienner & Quay,* for plaintiff.

*Wade Millis,* for defendant.

STEERE, J.    On May 2, 1917, a firm known as the Haley-Kennedy Construction Company, officed in the Penobscot building at Detroit, gave to plaintiff, Smith, a contract for purchase of a lot in a subdivision in the south part of Oakland county near Detroit, at a stated price of $2,445, including in said contract a residence to be erected thereon by the construction company according to certain specifications made part of the contract.    The contract provided for a cash payment of $600, with deferred payments of $25 each month for five years, when the unpaid balance fell due.    At the time of making the contract plaintiff made the $600 down payment and thereafter made but two more payments of $25 each, the last on June 30, 1917.    The contract contained the following provisions:

"Said party of the second part also agrees to pay all taxes and assessments, extraordinary as well as ordinary, that shall be taxed or assessed on said premises from the date hereof until such sum shall be fully paid as aforesaid.

"And it is also agreed, by and between the parties to these presents, that the said party of the second part shall and will pay the expenses of keeping the buildings erected and to be erected, upon the land above contracted for, insured against loss and damage by fire, by insurers, in manner and amount approved by the said party of the first part, such expense to be chargeable hereon if paid by the party of the first part.    *    *    *

"It is mutually agreed between said parties, that the said party of the second part shall have possession of said premises on and after this date, while he shall not be in default on his part in carrying out the terms hereof; * * * and if said party of the second part shall fail to perform this contract, or any part of the same, said party of the first part shall, immediately after such failure, have a right to declare the same void, and retain whatever may have been paid hereon, and all improvements that may have been made on said premises, and may consider and treat the party of the second part as its tenant holding over without permission, and may take immediate possession of the premises, and remove the party of the second part therefrom."

The contract is signed by "Haley-Kennedy Construction Co. Per H. B. Haley" and plaintiff, "John Smith." It was never recorded. At the time it was given the record title to the lot was held by Edson H. Fuller and wife. On May 18, 1917, they deeded it to the Haley-Kennedy Construction Company, and the deed was recorded in the office of the register of deeds of Oakland county on May 23, 1917.

Shortly after date of the contract to plaintiff the Haley-Kennedy company commenced construction on the lot of the residence provided for. They excavated the cellar, dug a well, erected, roofed, and inclosed the building, except doors and windows, then abandoned it and never resumed the work or possession of the lot.

In June, 1917, the Haley-Kennedy company desired to borrow some money and applied to defendant O'Dell for a loan, showed him this lot with the unfinished building upon it, then half completed as he estimated, and claimed they wanted the money to complete the building in order to be able to sell it. They furnished him an abstract of title which he showed to his attorney who pronounced the title of Haley-Kennedy company good. Defendant then made the company a short time loan of $1,200, secured by a mortgage on

the property, dated June 29, 1917, payable in two months "with interest at the rate of 6 per cent. per annum." The mortgage ran from "Robert B. Haley and Ruby Irene, his wife, and Harry B. Kennedy and Jennie Anna, his wife, the said Robert B. Haley and Harry B. Kennedy being copartners doing business under the name and style of Haley-Kennedy Construction Company, of Detroit," to defendant. It was recorded in the office of the register of deeds of Oakland county on July 6, 1917. It was not paid when due and defendant left it for collection with his attorney who had passed upon the abstract.

After written notice and demand mailed to the Haley-Kennedy company, which was ignored, foreclosure proceedings were commenced by advertisement. Affidavit of publication was duly filed showing that the notice of sale was printed in the Pontiac Press Gazette during 12 consecutive weeks, the dates of publication of said notice being October 24, 31, November 7, 14, 21, 28, December 5, 12, 19, 26, 1917, January 2 and 9, 1918. At foreclosure sale the property was bid in by defendant for the sum of $1,297.66. An affidavit in usual form by the sheriff who made the sale was filed, showing it was sold to defendant as the highest bidder, on January 12, 1918. A sheriff's deed in usual form was executed and filed with the register of deeds, indorsed by the sheriff's certificate that it would become operative one year from January 12, 1918, unless sooner redeemed. This deed was duly recorded by the register of deeds on January 21, 1918. After it was recorded and the year's equity of redemption had expired the deed was delivered to defendant who took possession of the premises, paid all accrued delinquent taxes and settled the mechanics' liens which had been placed upon the property by labor and materialmen, expending for and on the property in various ways, including the mortgage, up-

wards of $2,500, as his undisputed testimony showed.

On December 6, 1917, plaintiff commenced an assumpsit action by summons in the Wayne county circuit court against the Haley-Kennedy Construction Company, and Kennedy, the *ad damnum* clause in the declaration being $1,000. No further proceedings are shown in that case. On December 12, 1917, plaintiff brought another action commenced by summons in the same court against H. B. Kennedy Construction Company as successor of the Haley-Kennedy Construction Company, and H. B. Kennedy. A declaration was filed containing all the common counts in assumpsit and a special count for breach of contract, in part as follows:

"The plaintiff further avers that under and by virtue of the said instrument H. B. Kennedy, individually, and the said H. B. Kennedy Construction Company, the defendants herein, are answerable to this plaintiff for the damage sustained by him by reason of the breach of said contract by the said Haley-Kennedy Construction Company. That by reason of the said breach of the said contract the plaintiff was deprived of six hundred and fifty dollars heretofore paid by him to the said Haley-Kennedy Construction Company as hereinbefore set forth and was deprived of the rents and profits, the premises conveyed to him and the building to be erected thereon, would have brought, had the said defendants complied with their contract and completed the said building within the time stipulated."

On February 15, 1918, plaintiff recovered judgment against the H. B. Kennedy Construction Company for $683.75, which exceeded the amount he had paid on his contract.

On April 5, 1919, plaintiff filed a bill against defendant in the circuit court of Wayne county, in chancery, to set aside said mortgage foreclosure and sheriff's deed; filing a *lis pendens* in Oakland county on April 12, 1919, giving notice of commencement of said suit. On September 26, 1919, that suit was dis-

missed for want of jurisdiction, as the real estate to which it related was located in Oakland county, while the suit was brought in Wayne. Not very long thereafter plaintiff commenced the instant case for like purpose in the Oakland county circuit court, in chancery, and filed his amended bill on February 23, 1922. That bill, under which this case was heard, asserts he has an equitable interest in the property in dispute and right to relief by reason of his 1917 unrecorded contract, alleges it had not been forfeited, and defendant's foreclosure proceedings are void because of short time advertisement; that while he was legally in possession under his contract defendant unlawfully took physical possession of the same, claiming ownership, etc., under a void foreclosure of a mortgage given him by the construction company, and has since contracted to sell the property to others; praying a decree that defendant's invalid mortgage foreclosure be set aside and his rights held inferior to those of plaintiff; that if the foreclosure proceedings be held valid plaintiff be permitted to redeem and an accounting be ordered by defendant for any rents or profits he has received since he took possession of the property, concluding with a prayer for general relief.

Defendant answered in denial, alleging plaintiff was never in actual possession of the property, nor even in constructive possession after he early defaulted in payments on his contract, had elected to proceed against the construction company for damages and prosecuted his action against it to a final judgment for all which he had paid them; that defendant's mortgage and foreclosure proceedings were of public record, the property was neglected and vacant when he openly took possession of it after the equity of redemption under his foreclosure had expired, and completed the building; that by reason of his defaults and subsequent course plaintiff is estopped from asserting any equitable

rights in a court of chancery under his unrecorded contract.

The case was eventually removed by stipulation to the Wayne county circuit court, in chancery, for hearing, where it was heard on pleadings and proofs taken in open court at the 1922, April term, resulting in the court's dismissal of plaintiff's bill of complaint, from which he appeals.

The trial judge held it unnecessary to pass upon the validity of the foreclosure, because, regardless of that question, he found from the evidence, considered in its entirety, plaintiff had defaulted in, abandoned and forfeited his contract, held no legal or equitable title in the property which the court could recognize in this proceeding, and was not entitled to relief in a court of equity.

Beyond the record evidence and certain uncontroverted facts, the testimony of the parties to this case is in marked dispute. After a careful comparative reading of their testimony in the light of the written evidence and undisputed facts, we cannot disagree with the trial court's conclusion that plaintiff's testimony is so reckless, inconsistent, and palpably at variance with conclusively shown facts that it cannot prevail against that of defendant.

These parties became interested in this lot in May and June, 1917, through the machinations of this partnership of predatory real estate operators called the Haley-Kennedy Construction Company. On May 2, 1917, plaintiff contracted to buy this vacant lot from that firm, which agreed to build a house upon it. The firm then had no record title to the lot nor, so far as shown, even any right to possession of it granted by the owners, beyond what inference may be drawn from its obtaining a deed from them on May 18, 1917. At or about the time it contracted to sell plaintiff the property the firm took possession of the lot and started

to construct a building upon it as agreed. Assuming that under his contract plaintiff had constructive possession while not in default, he is not shown to have had such actual possession as would give any notice to a stranger of his rights.

Having secured title to and actual possession of the lot and partially constructed the building upon it, the firm proceeded to negotiate a loan upon the property from defendant, ostensibly to complete the building. They first took him up there on Sunday, showed him the property, what work had actually been done and material on the grounds for its continuance, leading him to believe from what he saw and they told him that they were energetically pushing the work to completion and the loan was needed to continue it. As the situation appeared to him he was satisfied with the security, but took the precaution to require an abstract which he turned over to his attorneys, who pronounced the title of the proposed mortgagors good. The mortgage was executed June 29, 1917, and recorded July 6, 1917. Neither of the parties to this suit knew or had heard of each other until some time in the spring of 1919, after defendant had foreclosed his mortgage and the equity of redemption had expired, as each testifies. Each soon learned that the construction company had abandoned its contract and deserted the lot with the unfinished building upon it. Both claim to have frequently visited the property thereafter. Defendant's consistent story is that after he learned of the construction company's abandonment of the place he visited it occasionally, saw the condition it was in, that in the beginning of the winter of 1917 he took a man with him and boarded up the doors and windows of the house to protect it against weather and trespassers, but on advice of his counsel did nothing further until the equity of redemption upon his mortgage had expired, when he took possession, proceeded

to finish the building so that it could be sold, and offered the place for sale in the spring of 1919, before he saw or learned of plaintiff.

Plaintiff, on the other hand, testifies that he was in possession all this time, watching and frequently visiting the property, and in the late summer or fall of 1917 he himself boarded up the doors and windows of the place. His claims and confusing manner of testifying are illustrated by the following excerpts:

"One week after this contract was made the construction of the building was begun. * * * The construction stopped about two weeks after they started, that is about three weeks after the contract was drawn up and signed. * * * The construction stopped some time before June. I did not make any more payments because they refused to take any more money after I went down on the ground. * * * That was about 30 days after the last payment. * * * The reason was because they stopped completion of the building, * * * they were not going any further with the work, and they were in arrears in their time, within which it was to be completed, and I was hounding them every day to get the building completed according to the contract. I started suit some time in December. It was then they stopped doing work on the building. * * * The copartnership of Haley and Kennedy was dissolved about three months after signing my contract. I boarded up the building on the premises about three or four days after the company dissolved partnership. * * * There was no lumber paid for, there was no cement blocks paid for; the plumbing was not paid for; the plaster was not paid for, and the well was not paid for; and is not paid for yet, and I agreed to take it over for the money I had in it and complete it, and pay all bills against it for labor and material. * * * No writing was executed between me and Haley-Kennedy Construction Company outside of the contract, Exhibit 3. That is the only instrument between us. I made no efforts to complete the building. * * *

"Q. I am asking now when did you find out that Mr. O'Dell claimed some interest in the property?

"*A.* It seems to me to be about three or four months after.

"*Mr. M.* (Defendant's attorney) : After when?

"*A.* After I got through with Haley and Kennedy. I had a talk with Mr. O'Dell at that time.  *  *  * The way I found out Mr. O'Dell had an interest in this property was that Mr. O'Dell was on the property one Sunday morning, and a cousin of mine was over there and he wanted to sell it to him, and he came and told me, and Mr. O'Dell told me he had it advertised, I did not see the advertisement. I immediately went to him, next day.  *  *  *

" (Cross-examination.)

"*Q.* When was the first time you examined the title, before you saw Mr. Beckenstein?

"*A.* My brother, when I arranged with the Haley-Kennedy Construction Company to take the building from their hands and complete it, my brother went out to Pontiac, looked up the records to see if there was anything on file, any mortgage or anything else, and there wasn't anything on file at that time, according to his statement.  *  *  * He said at the time there was not anything recorded against it.  *  *  *

"*Q.* And after that, the company, the Haley-Kennedy Construction Company worked for two weeks?

"*A.* About that time.

"*Q.* So that they ceased to do any work after about the 25th of May?

"*A.* About that time.  *  *  *

"*Q.* And there was considerable material and plaster around the place?

"*A.* All the material was on the job.  *  *  *

"*Q.* Well, how was it that you did not see Mr. O'Dell's men working around there?

"*A.* Mr. O'Dell never had any men working on the job to my knowledge.

"*Q.* You do not deny that Mr. O'Dell did not complete that house, do you?

"*A.* I do not deny that he did not complete, and I do not deny that he did complete.  *  *  *

"*Q.* What did you do in that property during the year from January 12, 1918, to January 12, 1919?

"*A.* Nothing.  *  *  *

"*Q.* While you were there two or three times a week, was any one living—

"*A.* I do not know.

"*Q.* What is your recollection of any one living in that property during that whole year?

"*A.* I cannot give you the date people moved in. * * *

"*Q.* The bill of complaint was filed herein in April, 1919, and I believe you said you saw Mr. Beckenstein —rather Mr. O'Dell about three days before you went down to see Mr. Beckenstein, so, that would be some time in the middle of April, 1919?

"*A.* I think we have it here down on the 1st of April. * * *

"*Q.* Up to that time you had seen nobody living in the property?

"*A.* The place was vacant. * * *

"*Q.* Had you done any improvements on that property for one year prior to that time?

"*A.* No, sir.

"*Q.* And you said you never paid taxes on it?

"*A.* No, sir. * * *

"*Q.* Who completed that house? Do you know who made it habitable?

"*A.* I do not know. * * *

"*Q.* Well, if all the material was on the job to complete it, why didn't you complete it?

"*A.* Because I was working for the Ford Motor Car Company at the time.

"*Q.* You say you are a woodworker yourself?

"*A.* Yes, sir. * * *

"*Q.* Witness, did you ever pay off any mechanics' liens on that property?

"*A.* No one did as I ever knew. * * *

"*Q.* Did you know that that company (Mellen Wright Lumber Company) was foreclosing a mechanic's lien?

"*A.* I believe that was the lien that was nailed onto the building."

Plaintiff's claim that he was in actual possession of and caring for this property after the construction company left it is not borne out by the proofs, or even his own testimony. The only direct physical act of possession on the premises to which he testifies was boarding up the doors and windows of the unfinished

building, which defendant positively testified was done by himself. After a comparison of their testimony in the light of surrounding circumstances we are in accord with the finding of the trial court that it was done by defendant. The latter's testimony that after the construction company left the place it remained deserted with no signs of possession by any one until he took possession under his foreclosure deed in the spring of 1919 is fairly borne out by plaintiff's own testimony. On cross-examination he was asked and answered:

"*Q.* Up to that time (April, 1919) you had seen nobody living in the property?
"*A.* The place was vacant. *  *  *
"*Q.* Had you done any improvements on that property for one year prior to that time?
"*A.* No, sir."

Under such a state of facts it is idle for plaintiff to contend that defendant's rights under his mortgage should be held inferior to plaintiff's defaulted and unrecorded land contract, or ask that if the foreclosure be held valid he be permitted to redeem. He testified that during all the intervening time until he learned of plaintiff offering the place for sale in 1919 he visited the property two or three times a week. If he did, he must have seen some one had boarded up the doors and windows late in 1917, and later that some one had possession of the premises and was engaged in completing the unfinished building, but stood by and made no objection while that work was in progress, until defendant had honestly incurred the expenses of that undertaking, necessarily increasing its value and salability, and offered the place for sale. A party who, having a right to property, sees another dealing with it inconsistent with that right and stands by without making objection while such acts are in progress, may not subsequently complain. *Truesdail*

v. *Ward,* 24 Mich. 117.    The overwhelming proofs in this case show such gross negligence and laches on the part of plaintiff in this affair as to divest his claim of any equitable standing against defendant.

His only possible suggestion of legal right is his technical claim that the foreclosure is invalid because the notice of sale in defendant's foreclosure proceedings set the date for selling the property short of 12 full weeks from the first publication.    The mortgage, was, however, of public record from July 6, 1917.    The notice of sale was published in a newspaper circulated in the county where the property is located for 12 successive weeks, the foreclosure proceedings were duly filed as the law requires in the office of the register of deeds, including the sheriff's deed to defendant on foreclosure sale, to be recorded after the year's equity of redemption from date of sale expired; but it was not recorded or delivered to defendant until after a full year would have elapsed had the date of sale been set for more than 12 weeks from the first publication.

Granting, however, that the foreclosure is invalid and some right may yet survive to plaintiff under his unrecorded and defaulted contract, that right is primarily against those with whom he contracted and who hold title to the fee of this property subject to defendant's unforeclosed mortgage.    They are not made parties to this suit and his right against them to enforce specific performance of his defaulted contract is an open question determinable only in an adversary proceeding between them.    It has been held that specific performance is not a clear matter of right to a defaulting party who has failed to perform his obligations under a contract of purchase.

"But no one can ask relief to which he has lost his strict right when his own conduct renders it unjust that he should have it."    *Gram* v. *Wasey,* 45 Mich. 223, 229.

Plaintiff's prayer for right to redeem is but an idle gesture.    He makes no tender, or offer to redeem, and gives no assurance to the court that he would or could do so if granted that right.

We discover no impelling reason to disturb the result reached by the trial court, and its decree will stand affirmed, with costs to defendant.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.