RICHARD G. PETERS v. JOHN CANFIELD.

*Land contract—Time of performance—Equity—Estoppel.*

Complainant, as assignee, filed a bill for the specific performance of a land contract, and in granting the relief prayed for the Court held:

1. That construing the contract as a whole, giving effect to its whole tenor, and taking into consideration the conduct of the parties under it, it would operate as the grossest injustice and fraud to hold that time was essential in the performance of the contract by the assignor, and that equity is powerless to relieve against the strict letter of the instrument.

2. Without passing upon the validity or effect of a clause requiring assignments of the contract to be indorsed upon both duplicates, the Court hold it competent to waive such provision by parol, and, if verbal assent to an assignment is given, it is a waiver of such requirement.

3. Where witnesses are equally creditable, and one asserts and the other denies a fact, and there is nothing else to turn the scales, the affirmative is not established.

4. A person who keeps silent when he should have spoken will not in a court of equity be heard to speak when he should keep silent.

5. A person who stands by and permits another to deal with his property as his own, the purchaser relying upon appearances, will not be permitted, after the transaction is closed without objection from him, to question it.

6. An agreement for the payment of the purchase price of land contained in a contract under seal falls within the ten-year clause of the statute of limitations.

7. This case is essentially one of fact, and the propositions above stated are designed as a key to the opinion, an examination of which is necessary to a correct understanding of the questions involved.

Appeal from Manistee. (Judkins, J.) Argued February 14, 1889. Decided April 19, 1889.

Bill for specific performance. Both parties appeal.
Decree modified and affirmed. The facts are stated in
the opinion.

*A. J. Dovel (Benton Hanchett,* of counsel), for com-
plainant, contended:

1. The specific performance of the contract rests in the sound dis-
   cretion of the court, which is to be determined by the partic-
   ular circumstances of the case; citing Pom. Spec. Perf. § 35;
   *Smith v. Lawrence,* 15 Mich. 499; *Young v. Daniels,* 2 Clarke
   (Iowa), 126; *Armstrong v. Pierson,* 5 Id. 326; *Quinn v. Routh,*
   37 Conn. 16.

2. It is a maxim of equity to look upon that as done which ought
   to have been done; citing 1 Story, Eq. Jur. (12th ed.) § 64 *g*;
   *Taylor v. Longworth,* 14 Pet. 172, 177.

3. The conduct of Canfield should estop him from denying Sweet's
   interest in the contract and his right to sell; citing *Truesdail
   v. Ward,* 24 Mich. 134; *Beatty v. Sweeney,* 26 Id. 220, 221;
   Herm. Estop. § 423; Big. Estop. 500

4. The clause in the contract that assignments shall be indorsed on
   both duplicates is one which the courts will not enforce or
   regard, and in this case it has been disregarded by the defend-
   ant in his sales of land and timber; citing *Wagner v. Cheney,*
   20 N. W. Rep. 222; *Ins. Co. v. Earle,* 33 Mich. 153; *Ins. Co. v.
   Carrington,* 43 Id. 254, 256.

5. The court will not regard the provision that time is of the
   essence of the contract, because such provision, under the cir-
   cumstances of the case, is not reasonable, but will treat the
   contract as if no such provision were made; citing *Richmond v.
   Robinson,* 12 Mich. 196, 200, 202; *Daily v. Litchfield,* 10 Id. 37,
   38; Pom. Spec. Perf. §§ 337, 381, 394, 397, 418; and as to when
   intention to waive strict performance may be shown, see Wat.
   Spec. Perf. 478, 482, 483; Fry, Spec. Perf. 745; and such
   waiver, or an extension of time for performance where a con-
   dition precedent, is equivalent to such performance at the stip-
   ulated time, and leaves the original contract intact, and the
   party for whose benefit the condition is made waives it by any
   act which would make its enforcement unjust; citing *Wallace
   v. Pidge,* 4 Mich. 570; *Harrington v. Brewer,* 56 Id. 301

*Ramsdell & Benedict,* for defendant, contended:

1. The court has discretionary power to refuse specific performance,
   where the contract has been complied with, for equitable

reasons, but no discretionary power to excuse in the complainant his gross laches and default to enable him to speculate on defendant's capital; citing *Willard v. Tayloe*, 8 Wall. 557; *Marble Co. v. Ripley*, 10 Id. 339.

2. Securities need not be delivered up on cancellation of a contract when they are over-due notes, as there can be no *bona fide* purchaser of such paper; citing *Phelps v. Railroad Co.*, 63 Ill. 468, 476; *Fitch v. Boyd*, 55 Id. 307.

3. When time is of the essence of a contract, made so by the agreement of the parties, a court of chancery is bound by it to the same extent as a court of law; citing Pom. Spec. Perf. § 384, and cases cited, 390, 401, and notes; *Richmond v. Robinson*, 12 Mich. 19; *Gram v. Wasey*, 45 Id. 223; *Benedict v. Lynch*, 1 Johns. Ch. 370.

4. It seems to be an invariable rule in equity that, when a defendant has denied that he will be bound by the contract, any delay in bringing a bill for specific performance is fatal to the application, especially when the complainant is not in possession; citing Pom. Spec. Perf. § 412; *Colby v. Gadsden*, 34 Beav. 41S; *Simpson v. Atkinson*, 39 N. W. Rep. 323; *Requa v. Snow*, 18 Pac. Rep. 862; *Smith v. Lawrence*, 15 Mich. 499; *Hawley v. Jelly*, 25 Id. 94; *De Cordova v. Smith*, 58 Am. Dec. 136.

CHAMPLIN, J.   The complainant asks for a specific performance of a land contract executed by John Canfield for the sale of an undivided half of certain lands therein described to John Sweet, dated September 12, 1871, and assigned by John Sweet to Peters on November 21, 1881. The quantity of land covered by the contract is the undivided half of 2,480 acres.

Previous to September, 1871, John Sweet was experienced in estimating the quantity of pine standing upon land, and had been employed by Mr. Canfield as an estimator, who had confidence in his honesty, ability, and accuracy in estimating pine lands.   All the parties thus far named resided at Manistee, Mich.   Canfield and Peters were lumbermen, and had been actively engaged in buying pine lands, and in manufacturing lumber.   Mr. Sweet, acting for himself, had obtained plats of these and other lands belonging to the Grand Rapids & Indiana

Railroad Company, which were offered for sale by that company, and had gone personally into the woods, examined and estimated the quantity of pine on such lands, and made minutes thereof for his own benefit, which were valuable to him either to sell or as a means of making a purchase of the lands or of an interest in them. The looking of lands in this way was a business well known, and the information so obtained was valuable. Having obtained knowledge of these lands through a personal examination, he went to Canfield with his minutes, who states what transpired between them substantially as follows:

In September, 1871, Sweet showed Canfield the maps of these lands, and the estimates he had made of the pine contained thereon, and wanted to sell the minutes to him, or make some arrangement whereby Canfield would enter the lands, and sell him an interest in them; "or, in other words, to make a profit out of the knowledge he had acquired." After considerable conversation, the understanding was arrived at that Canfield should buy the lands, pay the money, and sell him a half interest, substantially the same as the agreement embraced in the written contract dated September 12, 1871. The agreement, however, was not closed at the first interview; Sweet saying he wanted to see his brother with regard to the value of some of those lands, and he left Canfield with a promise to return in a short time, and promised, at Canfield's request, that in the mean time no one should have the benefit of the minutes, and that they should not be exhibited to any one, or his estimates. He did not return as soon as Canfield expected, and, upon inquiry for him upon the streets, was told that he had been seen in Robinson's office showing some plats. Canfield then quietly procured a tug to take him to Grand Haven, from whence he proceeded to Grand Rapids, and

purchased the land for the sum of $41,520, including his charges. On his return to Manistee he informed Sweet that he had purchased the land, at which he expressed surprise, and the matter ran along until about December 13, 1871, when Canfield tendered to Sweet a contract drawn up substantially as had been talked of in the first interview. He made some objection, but they came to an agreement, and it was executed as of September 12 previously. The contract price which Sweet agreed to pay Canfield for the half interest was made up by taking the $41,520, and computing interest compounded at the rate of 10 per cent. per annum for three years, which amounted to $55,263.12, one-half of which was taken as the purchase price to be paid by Sweet for the undivided half of said land.

By this contract Canfield agreed to sell to Sweet the one undivided half of certain land described in a schedule thereto attached, for the sum of $27,631.56, and Sweet agreed to purchase said lands for that sum, and to pay Canfield at his office, in the city of Manistee, on September 12, 1874, and gave to Canfield his promissory note, dated September 12, 1871, payable on September 12, 1874, for that amount, without interest. Sweet further agreed to pay one-half of all taxes levied on the land from and after the date of the agreement.

He further agreed that he would not cut or remove, or permit to be cut or removed, any timber or logs from the lands until full and final payment for said land, and, if this stipulation was violated, it was agreed that the logs and lumber manufactured therefrom should be and remain Canfield's property, and such violation should, at his option, operate as a forfeiture of the rights and claims of Sweet under the agreement.

Upon payment of the purchase money and one-half of the taxes punctually at the time limited therefor, and

strictly and literally keeping and performing all and singular the promises, agreements, and stipulations contained in said contract by Sweet to be kept and performed, Canfield agreed to convey on request of Sweet and surrender of the contract, by quitclaim deed, the undivided one-half interest of said premises. But in case Sweet, his legal representatives, heirs, or assigns, failed to make the payments punctually, and upon the strict terms, and at the time and place limited and provided, or all of his promises, agreements, and stipulations, then Canfield had the right to treat and consider the contract as abandoned and forfeited by Sweet, and he should forfeit and lose all right or claim under the contract, and be liable to Canfield in damages, and thenceforth be deemed a mere tenant at will, holding over contrary to the terms or conditions under which he held, and might be removed from said premises without notice to quit, in the manner provided by law for the removal of a tenant in such case; and it should be lawful for Canfield, after such violation or non-fulfillment of the contract, to sell and convey such lands without liability in law or equity for damages, or to refund any part of the purchase money which may have been paid.

The contract then contains the following clauses, which we quote entire:

"And it is hereby expressly understood and declared that time is and shall be deemed and taken as the very essence of this contract, and that unless the same shall in all respects be complied with by the said party of the second part, at the respective time and in the manner herein limited and declared, the said party of the second part shall lose and be debarred from all rights, remedies, or actions, either at law or in equity, upon or under this contract. And the said John Sweet also promises and agrees that he will pay one-half of all the charges and expenses in the care and management of said land, and he will without charge look after said land, sufficient to

report all trespasses thereon, and that he will also show, or cause to be shown, said lands to customers who wish to purchase when requested so to do by said John Canfield, and without charge.

" And it is further expressly agreed, and in the foregoing agreement is so qualified, that in the mean time the said John Canfield has the right to sell and dispose of any or the whole of said lands, or the timber on the same, at such price as to him seems best, it being the best price he can at the time obtain; in which case the sum aforesaid, at which an undivided one-half ($\frac{1}{2}$) of said lands can be purchased by Sweet on September 12, A. D. 1874, shall be diminished by the amount of one-half ($\frac{1}{2}$) the net proceeds from such sale or sales, with interest at ten per cent. per annum on the same from the time of receiving said money, and, if such half exceeds the purchase price aforesaid of an undivided half of the whole, the said John Canfield agrees to pay such excess to the said John Sweet, first deducting any other dues from said Sweet. This contract is executed in duplicate, each party holding an original copy; and it is expressly agreed by the parties hereto that no assignment thereof, or of the premises above described, shall be of any validity or force whatever, unless such assignment be made on each of said duplicate originals. And no assignment or transfer of any share or interest of or in the contract or the said premises, less than the whole, shall be recognized or admitted by said party of the first part under any circumstances, or in any event whatever.

" And it is further expressly agreed that any consent which may be given to the assignment of this contract, or any recognition thereof by the said party of the first part, shall not exempt the original purchaser from any of his liabilities under this contract, but the same shall thereafter continue in force as against said party of the second part, notwithstanding such assignment and consent or recognition.

" In witness whereof the said parties to this contract have hereunto subscribed their names and affixed their seals on the day and year first above written.

"John Canfield.   [Seal.]
"John Sweet.      [Seal.]

"Signed, sealed, and delivered in presence of

"E. P. Case."

After the date of the contract, but before it was actually executed, namely, on or about November 20, 1871, Canfield sold a portion of the lands covered by this contract to the firm of Canfield & Wheeler, of which firm defendant was a member; and on the day last mentioned Canfield & Wheeler entered into a contract with Michael W. Gallagher to cut and put in the logs in the South Branch of the Manistee river, not less than four millions a year. The price at which the logs to be cut from the lands in question were sold was two dollars a thousand feet, board measure. On June 4, 1872, Canfield sold to the firm of Canfield & Wheeler the timber upon another portion of the lands covered by the contract with Sweet, the said sale purporting to have been made with the concurrence of Sweet, at two dollars a thousand feet. No time was stated when the timber should all be cut and removed, but it was agreed that not less than three millions should be cut in each year. Subsequently Canfield & Wheeler let the contract to Gallagher to put in the timber from this land. On September 17, 1879, Canfield gave a permit to Davies, Blacker & Co. to cut from certain descriptions of the land covered by the contract in question all the pine timber thereon, and upon their putting such timber afloat, and driving it to the mouth of the Manistee river, and paying him $5,574, and interest, Canfield agreed to convey his title to the logs subject to charges, liens, and assessments.

Defendant, Canfield, kept an account upon his books of the expenditures and receipts incurred on account of and received from sales of timber on said lands, which was headed "John Sweet Land Contract No. 1," in which he entered all the sums paid out, and all moneys which he received on account of said lands. After the sales to Canfield & Wheeler, Mr. Canfield said to Sweet that it

looked then as if the contract would take care of itself. At the time the purchase price named in the contract was payable, namely, on September 12, 1874, nothing was said by either party about payment. The contracts with Canfield & Wheeler had not then been closed up, and Gallagher continued to put in logs under his contracts made with Canfield & Wheeler until 1878, and the avails of the timber so put in were carried by Canfield in his account to the credit of the John Sweet contract No. 1. He also did the same with the avails of the timber sold to Davies, Blacker & Co. in the fall of 1879, the last credits under this contract being entered as of date September 10, 1880. Mr. Sweet testifies that Mr. Canfield talked with him about this sale, but it does not appear very satisfactorily whether it was before or after the sale was made to Davies, Blacker & Co.

In 1871, Sweet became a member of the firm of Tyson, Sweet & Co., and this firm engaged extensively in lumbering at Manistee. Their operations were mostly upon credit, and in the fall of 1874 they had become insolvent. On March 21, 1877, John Sweet and Benjamin Sweet, two of the members of the firm of Tyson, Sweet & Co., filed their petition in the court of bankruptcy for the Western district of Michigan, and in the schedules annexed to the petition no mention is made of the contract of date September 12, 1871, as an asset, nor of the note or indebtedness created by the contract as a liability. They were duly adjudicated bankrupts, and Adolphus Stumes of Manistee, Mich., was appointed assignee, and on April 23, 1877, the usual assignment was executed to him. On October 16, 1880, the bankrupts received their discharge, and it is a fact in the case admitted by stipulation that the assignee was discharged.

On September 12, 1880, it appears from the account kept by Mr. Canfield with this Sweet contract, that, charging

against it all expenses and interest thereon, compounded at 10 per cent. down to this date, and crediting all receipts from sales of timber and interest thereon compounded at 10 per cent. to same date, the balance was $43,027.19 to the credit of the contract. It also appears that the purchase price of the land agreed to be paid by Sweet, with compound interest at 10 per cent., amounted on September 12, 1880, to $48,950.97; leaving a balance unpaid upon the contract at that time of $5,923.78, and, according to the testimony, over one-half of the timber was then standing upon the land.

It is proper here to call attention to a conversation which occurred between Canfield and Sweet about this time, as appears from the above dates. On the cross-examination of Mr. Sweet, he testified as follows:

" *Q.* Wasn't it understood between you and Mr. Canfield, prior to the time you made application for discharge in bankruptcy, that this contract was terminated and no longer binding?

" *A.* No, sir; I never talked with him to that effect.

" *Q.* Did you not ever have any conversation with Mr. Canfield to that effect at all?

" *A.* I think I had some talk with him about the bankruptcy matter, but never talked with him about this contract being void.

" *Q.* Did you not, at the time you made your application in bankruptcy, understand you were wholly released from this contract and note, and that Mr. Canfield was released?

" *A.* No, sir; I did not.

" *Q.* Did Mr. Canfield say anything more than this: That possibly the lands might become valuable land,—he would expect to hold them,—and, if the land did become valuable land, he would be disposed to make you compensation for the time and expenses in locating and estimating the timber?

" *A.* I don't recollect any such conversation.

" *Q.* Was it not a question whether the lands at that time, in the state of the market, were worth the purchase price?

" A. Well, at that time it was a question whether they were or not. Pine timber was very low then. * * *

" Q. Did you make a petition in bankruptcy in the United States court for the Southern district of Michigan in the year 1877?

" A. Yes, sir; I did.

" Q. When you made that petition did you consider this contract in force?

" A. Yes, sir.

" Q. Had you not notified Mr. Canfield prior to that petition that you would not fulfill the contract?

" A. Not that I know of, I didn't.

" Q. Did you not afterwards receive your discharge in bankruptcy?

" A. I did.

" Q. Did you inventory or report this contract as any part of your assets?

" A. I did not.

" Q. Did you consider that there was any money in that contract at that time?

" A. Well, I thought there might be money in the future; I didn't think there was anything at the time for the creditors.

" Q. Well, for you to make an inventory?

" A. No, sir; I didn't think there was anything in it for me at the time; there might have been some benefit for me in the future.

" Q. Who was your assignee in bankruptcy?

" A. Adolph Stumes.

" Q. Did this contract ever go into his possession?

" A. Not that I know of.

" Q. Did you ever tell him anything about it?

" A. No.

" Q. When you obtained your discharge in bankruptcy, didn't you claim to them you had turned over all your property and assets?

" A. All that is of any value; yes sir.

" Q. Had you turned all your property that was of any value to Mr. Stumes, your assignee, had you done so ?

" A. Yes, sir.

" Q. Did you get your discharge in bankruptcy, October 16, 1880 ?

" A. I don't know just what date it was I did get it.

" *Q.* If you considered that you had any valued interest in that contract at that time, you would have turned it over to Mr. Stumes, your assignee ?

" *A.* Yes, sir; if there had been any value in it.

" *Q.* How long were the bankrupt proceedings pending ?

" *A.* Well, I don't know; three or four years.

" *Q.* During the pendency of these proceedings did you consider that you had any valuable interest in that contract ?

" *A.* I didn't think much about it. I didn't pay much attention to it. I didn't know where I stood. Mr. Canfield had the deed of the property, and I didn't know how the matter stood.

" *Q.* After your discharge in bankruptcy, when did you first speak to Mr. Canfield about it ?

" *A.* I don't recollect.

" *Q.* You didn't talk with him, did you, during the pendency of those bankrupt proceedings ?

" *A.* I may have talked with him, but I don't recollect about it."

When Mr. Canfield was giving testimony in his own behalf he narrates what occurred in this conversation, as follows :

" *Q.* Will you state whether or not at any time there was a distinct and express understanding between yourself and John Sweet that this contract was at an end, and the circumstances which led to the understanding ?

" *A.* There was such a time.

" *Q.* Will you state any conversation that you had with Sweet relative to the determination of this contract ?

" *A.* He came to see me—

" *Q.* Give the date, if you can.

" *A.* I can only fix the date by this :

" That it was just preceding the time he was going to Grand Rapids to get a decision on his application to be discharged as a bankrupt. He stated to me that that was what he was going for, and that he expected to be put on the stand, and perhaps swear with regard to it. He stated to me that he wanted to swear to nothing but the truth, and that there was a liability of my being called on to the stand, as some one—I understood it, whether he said this or not—was opposing his getting a

·discharge. He wanted to know how I understood the matter with regard to the two contracts with him. He asked me how I understood with regard to them,—what the situation was at that time. I replied to him that I understood that they were void, and of no effect, and at an end. He replied to me that he so understood it, but wanted to know before he went on the stand, so that I might not be put on the stand and contradict what he had sworn to. I said to him that there was a very easy way to get at that, and I gave him formal notice verbally that the contracts were at an end and forfeited, and after I had given that verbal notice he gave me a like notice on his part, merely repeating the language that I used. In the course of the conversation we talked over the situation with regard to the two contracts, and we agreed in this: That the contract number two, as I call it, to distinguish it from this number one, there was no possibility of my being able to sell at that time, or perhaps ever, at price enough to get my money back. We agreed on this: That it would be just about an even thing, probably, whether I could on the contract in this suit. That was all talked over amicably, and understood, and my impression is that this occurred at the door of our office, and that our book-keeper was out, so that I couldn't get at the contracts. At least, it was understood that the contracts were to be surrendered,—notes to be surrendered,—and that there was no claim on my part against him, nor on his part against me. After we had got through with this matter, and before Sweet went away, I said to Mr Sweet, 'You and Ben (I may have included Ben's name, or may have said "you") have done some work on estimating this timber timber, and it has cost you money,'—and alluded to his circumstances,— and I said to him that I should probably hold the timber in this group for some time, at least, until it was worth more than at that time, and that I hoped to be able to come out all right, and I said whether I did or not he should not lose the time and money that he had spent in making the estimates. He thanked me for the offer. I said to him, also, that I was keeping track of the lands in this group in an account by themselves, to see how they came out. He thanked me for the promise, and seemed very much pleased with it. I think I have covered all of importance that occurred at that interview."

On cross-examination he stated:

"Before we got through with it (as I think I didn't testify here before) he asked me the question with regard to the payment of damages, or the payment of the notes, and it was agreed between us that there was no damages to be paid and notes to be collected in connection with those two contracts."

On the re-examination of Mr. Sweet he testified as follows:

"Q. I want to call your attention to a statement made by Mr. Canfield when he testified the first time in the case, when he testified, in substance, that at a conversation which occurred between you and him it was understood between you and him that this contract in question was forfeited, and that he gave you notice of its forfeiture, and you gave notice to him. Did any such transaction ever take place between you and him?

"A. Never, to my knowledge. I don't recollect of any such thing.

"Q. Was there ever at any time any understanding between you and Canfield that that contract was at an end?

"A. No, sir."

Some time in February, 1881, Mr. Canfield furnished to Mr. Sweet a statement from his books of his account with the J. Sweet land contract No. 1. This statement contained all items of expenditures and receipts, with interest compounded at 10 per cent. per annum to September 12, 1880. It also embraced a statement of indebtedness of Sweet for the purchase price, with interest compounded at the rate of 10 per cent. per annum from the date of the contract, September 12, 1871, to September 12, 1880, showing a balance due from Sweet of $22,126.53. It is confessed, however, that an error was committed in computing interest on $27,631.56, from September 12, 1871, as the purchase price named in the contract included the interest on the actual purchase price from September 12, 1871, to September 12, 1874, and correcting this error,

which was not discovered until the testimony in this cause was taken, the balance was as above stated, $5,923.78.

There is a radical disagreement between Mr. Sweet and Mr. Canfield as to the facts and circumstances under which this statement was procured by Mr. Sweet. The claim of Mr. Sweet is that he was in Mr. Canfield's office some time in the fall of 1881, and they got to talking about this matter, and Canfield asked him what he would take for his interest in these lands, and he told him he would take $15,000, and Canfield said he would not pay it. He then asked Canfield to make a statement of the matter, how they stood, and asked Mr. Canfield if he would take money on it, and he replied that he would take any amount of money he (Sweet) had a mind to pay him, and he made the statement; that he told him that he had a chance to sell to other parties, some of whom he named, and gave that as a reason why he wanted a statement, and it was furnished him by Mr. Canfield; that after he got it he copied it into his book, and returned the original at Mr. Canfield's request. Mr. Canfield upon this matter testifies as follows:

"Q. Mr. Sweet has sworn that you gave him a statement relative to these lands,—a debit and credit statement. Will you state how you came to give him that statement.

"A. Mr. Sweet came to me some time preceding February 14, 1881, and said to me that he either had bought or was about buying him a home in Grand Rapids. He said to me: 'If you are ever going to do anything for me on that land matter, it would probably be worth more to me now than at any other time you could do it.' I said to him: 'I will make a figure of the ———'. In the first place I asked him what he would like me to do, and thought I ought to do; and his reply was that he didn't know what would be right, and left the matter with me. I said to him that I would make a figuring of or statement of the lands that were originally embraced

in this contract that I had agreed to keep an account of, and he could look it over, and he could better judge in regard to it. We had more conversation. I don't recollect anything except visiting now, particularly, at this time. As the result of that, I said to my daughter, who was one of my book-keepers at the time, to make a statement of the account, to compute the interest on it, debit and credit, at 10 per cent., compounded, and to figure and see how much the money I had invested would come to up to the same date, and see how the account stood. She made me that figuring. This is the one. Very shortly after Mr. Sweet was around, and I gave him the statement and requested him to look it over, and requested him or indicated to him that it would be a good idea to have Mr. Wente or some other competent accountant go over it, and see if it was correct. I hadn't been over it, but presumed it to be correct. I also said to him that I preferred that it be not shown to any one else, and when he had done so to return it to me, and this he promised to do. It ran along some time. I said in connection with that, that after he had done so to come and tell me what he thought I ought to do. It ran along some time, and he didn't come back. I should say that it was 60, and possibly 30, days. I then met him on the street, and called his attention to it, and asked him for the statement, and to come in. He said he would bring me the statement. It ran along some little time after that and the statement was finally returned to me.

"*Q*. In that conversation did you ask John Sweet how much he would take for his interest in the contract?

"*A*. I did not. I probably asked him what would satisfy him for my promise, but I don't recollect it.

"*Q*. State whether or not Mr. Sweet said to you he would take $15,000 for his interest in the contract?

"*A*. At that time he did not."

On November 21, 1881, Sweet sold to Richard G. Peters his undivided half interest in the lands covered by the contract, and assigned and transferred the contract to Peters for the consideration of $25,000, and Peters assumed and agreed to pay Canfield the balance due from

74 MICH.—33.

Sweet to Canfield, estimated at $21,189.51, and interest from September 13, 1880.

The most important question of fact contained in this record is whether Canfield was informed of the contemplated sale by Sweet to Peters, and consented thereto; and respecting this the witnesses Sweet and Canfield do not agree. The burden is upon the complainant; for if the witnesses are equally creditable, and one asserts and the other denies a fact, and there is nothing else to turn the scales, the affirmative is not established. In considering this question we cannot ignore the fact that Mr. Canfield recognized an obligation as due from himself to Mr. Sweet arising out of the contract relations between them. It is true that Mr. Canfield bases it upon an obligation arising out of charity, but dependent upon the benefits he expects to reap from the transaction. If his profits in the end are large, he expects to give more than if they are small; and, whatever his charity is, he gauges it by the pecuniary profits of the investment. But he acknowledges no legal obligation, and none that equity can take hold of and enforce. He claims that Sweet has no rights under the contract, because the purchase money was not paid on September 12, 1874; that by the terms of the contract prompt performance was essential; and, moreover, by express stipulation of the parties, time was declared to be of the essence of the contract. It was said in *Gram v. Wasey*, 45 Mich. 228 (7 N. W. Rep. 764), that—

"It has been held in this State that time is not generally so far of the essence of a contract that a failure to perform within a period specified will necessarily preclude a party from being allowed to perform subsequently. * * * But, on the other hand, when a vendee has failed to perform his obligations, relief is not a matter of right, and, while unimportant omissions may be disregarded,

relief will not be granted when, under all the circumstances, including the conduct of the parties, it does not appear just and reasonable. The ground on which equity relieves against forfeitures is that it would operate oppressively or fraudulently to refuse. But no one can ask relief to which he has lost his strict right, when his own conduct renders it unjust that he should have it."

The provisions of the contract between Canfield and Sweet are peculiar in some respects, and differ materially from the ordinary contract for the sale of land. While it conveys a present interest in the lands mentioned, so that in equity the contract is to be regarded as if specifically executed for certain purposes, and the purchaser became the equitable owner of the land, it differs in this: That ordinarily the vendee is in equity the trustee of the purchase money. This contract, however, changes this relation, and creates a trust in the vendor, and places in his hands and under his control a fund out of which the purchase money is to be or may be realized. It gives to the vendor the exclusive right to sell either the land or timber, or the whole, or any part of it, and out of the moneys received from such sale to apply one-half of the net proceeds upon the purchase money, and, if such proceeds exceed the purchase price, he is to pay one-half of the surplus to Sweet, the vendee. Thus at the out-set the contract places all the property purchased by Sweet under the control and disposition of Canfield, and the parties evidently contemplated, for they provided for the contingency, that Canfield would sell land or timber, or both, more than sufficient to pay the purchase price. This provision qualifies the whole agreement, and, instead of leaving the vendee as a trustee of the purchase money, transfers such trust to the vendor. It qualifies the provisions as to time and term of payment, as it does also the stipulation that time of performance shall be of the essence of the contract. Sweet is by the

agreement prohibited from cutting, removing, or selling any timber, and also from assigning or transferring any share or interest of or in the contract, or of the premises, less than the whole. Under these circumstances the duty was imposed upon Canfield to faithfully execute such trust in such manner as not to prejudice the rights of the purchaser.

. In construing this contract we must look at the situation of the parties, and the purposes they had in view in relation to it, and the circumstances out of which it arose. Mr. Canfield was a man of means, engaged in the lumbering business, and investing all his available means for that purpose in the purchase of pine-timbered land with a view to speculative rise in value. He knew Mr. Sweet as a land-looker and estimator of timber. He was aware that Mr. Sweet had not the means for paying $27,000 and over in three years, and was not likely to obtain it through any business he was then engaged in, within the time limited in the contract for payment. The lands were purchased by Canfield at Sweet's suggestion and proffer to take a half interest in the purchase, and they were purchased with a view to speculative rise in value in the future. This is shown by the testimony of both Mr. Canfield and Mr. Sweet. Any rise in value would inure to their joint benefit. They bargained with this benefit in view from the inception of the transaction, and the contract must be construed with reference to this object. The conduct of the parties affords additional aid in the construction which should be given to its terms. Acting under the trust reposed in him, Canfield almost immediately, and even before the contract had been reduced to writing, but in pursuance of what its terms should be, commenced to sell the timber from the lands to himself and partner. If he understood that time of payment was to be treated as the essence of the contract,

occupying the trust relation that he did, and making sale to himself and partner, he should, and we think would, have required the timber to have been cut and payments made before September 12, 1874. Instead of this, no time was limited, but a certain quantity at least was required to be cut annually; and the testimony shows that four years would have been a reasonable time to cut and remove all the timber sold to Canfield & Wheeler. This would have taken it beyond the time of payment specified in the contract. The second sale of timber to Canfield & Wheeler was not so limited as to protect Sweet's interest, if time was to be deemed essential. The work went on from year to year under these contracts until 1878, and during that time, and prior to September 12, 1874, Canfield told Sweet that it looked as if the sales would take care of the contract. Mr. Sweet testifies that this assurance was made to him as late as 1879.

On September 12, 1874, no account was rendered by Canfield of the net avails of sales, and no notice given that he should require the balance paid, and in default the contract would be forfeited. Mr. Canfield, however, was keeping an account with the lands included in this contract as he was in duty bound to do as trustee; and it was claimed, and the testimony tends strongly to show, that, if all of the timber sold to Canfield & Wheeler had been cut and put in at the contract price of two dollars a thousand feet, it would nearly or quite have paid the purchase price owing by Sweet. In 1879 another sale was made by Canfield to Davies, Blacker & Co., of which also an account was duly kept by Mr. Canfield, and the avails credited to this contract. Up to this time no claim had been made by Canfield that Sweet had forfeited his rights under this contract, or had abandoned it. He had it in his power to sell more timber or land than he did, but he did not do so. The testimony shows that from 1873 to 1879

there was a depression in the market for pine timber and pine land. It was a good time to buy, but not to sell, and Mr. Canfield, as opportunity offered, made investments in pine land. In not selling during this period, he exercised a wise discretion for the joint benefit of himself and Sweet; and especially was he justified in so doing, as the purpose of the transaction entered into between himself and Sweet was to make a speculation upon the rise in the value of the tract.

Construing this contract as a whole, giving effect to its whole tenor, and taking into consideration the conduct of the parties under it, it would operate as the grossest injustice and fraud to hold that time was essential in the performance of the contract by Sweet, and that equity is powerless to relieve against the strict letter of the instrument. The contract is that, in case of failure by Sweet to perform punctually, Canfield "should have the right to treat and consider the contract as abandoned and forfeited." It was optional with Canfield to treat it as forfeited. In such case, and more especially under the other provisions of the contract as to sale of timber by Canfield, equity required him, if he intended so to treat it, to give sufficient notice of such intention before the appointed time, and to render an account of the purchase money received under his trust. This is in the nature of a condition subsequent, against which equity will relieve upon a proper showing. He did not render an account, and did not give notice or treat it as forfeited, unless what occurred at the time Sweet was about applying for his discharge in bankruptcy can be construed into a *bona fide* notice of forfeiture. With regard to the occurrence referred to the parties differ widely in their testimony. Whatever view may be taken of the testimony, I do not think that what transpired upon that occasion redounds to the credit of either of

the parties to it.  Sweet had assigned all of his property, rights, and interests to his assignee in bankruptcy, and had no right to declare a forfeiture or solicit a declaration of forfeiture from Canfield, and Canfield had no right under the circumstances to declare one.  The testimony shows that the contract was valuable, and the purchase price had largely been paid.  Sweet had made no mention of it as assets, and did not schedule Canfield as a creditor.  Hence his discharge in bankruptcy would not have discharged his liability to Canfield.  It is apparent from what preceded and followed that interview that it was a mere ceremony gone through with without any intention that it should affect their rights under the contract, and it did not affect them, whatever their intentions were.  The discharge became an accomplished fact in October, 1880.  The next year we find Canfield rendering an account of the situation under this contract, and we find Sweet offering to sell his interest to Canfield for $15,000, which was refused.  We also find Sweet offering to sell to other parties, and finally to Mr. Peters. The testimony satisfies us that Canfield knew of Sweet's attempts to sell, and he admits that Sweet told him that Peters offered him $30,000.  Sweet testifies that he told him that Peters offered to give him $25,000, and that he consented that he might sell, and said he preferred that he should sell to Peters, as they owned other lands together.  Canfield admits that he thought of writing to Peters, but upon further consideration he did not think Mr. Peters would be so foolish as to make the purchase without first consulting him.  Sweet informed Peters before the sale to him was concluded that Canfield consented to his selling to him, and Peters relied upon such information.

The testimony is convincing that Canfield knew that Sweet was negotiating for a sale of his interest under the

contract, and that Peters had offered to pay him a very large amount of money therefor, and that Mr. Canfield never intimated to Sweet that he had no interest under the contract on account of its having been abandoned or forfeited, or for any other reason. He permitted the sale to be consummated without interposing any objections. A person who keeps silent when he should have spoken will not in a court of equity be heard to speak when he should keep silent. A person who stands by and permits another to deal with his property as his own, the purchaser relying upon appearances, will not be permitted, after the transaction is closed without objections from him, to question it. These are familiar axioms, upon which courts act in administering justice, and are applicable to this case.

The assignment from Sweet to Peters was executed November 21, A. D. 1881, by which Sweet sold to Peters all his interest under the contract for $25,000, payable as therein expressed. A day or two after the assignment Mr. Sweet met Mr. Canfield in Hart's office, and Canfield called him to one side, and asked him if he had closed the trade with Peters, and Sweet told him he had. Canfield then said he was going to bother Peters about the matter. He spoke jestingly that Peters had crossed his track, and he was going to bother him, and said that he (Sweet) need not worry about that, it would be all right with him. Mr. Canfield recollects meeting Sweet in Hart's office, but does not recollect any such conversation. Sweet communicated this information to Mr. Peters, who afterwards requested him to see Mr. Canfield in reference to the matter. Accordingly Mr. Sweet at one time visited Mr. Canfield in Chicago, and told Mr. Canfield that he did not like the way he was using Mr. Peters, and hoped that he would settle or arrange the matter in some way. Mr. Canfield said that he (Sweet)

need not worry about it; he was intending to bother Peters awhile.    Mr. Sweet said to him that he sold on his consent entirely, and would not have sold without, and he replied that he need not worry about it.

Some six or eight weeks after he made the purchase Mr. Peters called upon Mr. Canfield, and told him he had bought Sweet's interest, and requested him to write him a letter stating that he was satisfied with Sweet's sale, so that, in case of death or accident, he would have something to show that he (Canfield) knew of the sale, and was willing it should take place.    It is proper here to refer to a clause in the contract which has not been mentioned before.    It is this:

" This contract is executed in duplicate, each party holding an original copy; and it is expressly agreed by the parties hereto that no assignment thereof, or of the premises above described, shall be of any validity or force whatever, unless such assignment be made on each of said duplicate originals."

Mr. Peters testifies that Mr. Canfield replied that he would look up the contract, and let him know.    Mr. Canfield's version of this interview is as follows:

" He came to my office, and said to me that he had bought Mr. Sweet's interest in the contract, expressing it so that I understood what contract he meant.    He said there was nothing in it to show that there was any interest there.    He said that the interest on it at 10 per cent. was too high, and asked me to re-instate (I use that word; I am not sure that that's the word that he used) the contract, and reduce the interest to 7 per cent., and give him two years to pay on it, as he hadn't the money to pay.    The interview was very short.    My reply to it was that I hadn't seen the contract for some years, but I would look it up, and see what the contract was, and let him know.    I will not undertake to use the exact language, but give the effect and meaning of it."

A short time thereafter he addressed the following letter to Mr. Peters:

"MANISTEE, Feb. 27, 1882.

"MR. R. G. PETERS,

"Manistee.

"*Dear Sir:* In accordance with the talk with you, I have looked over that old contract, and I see no reason why I should write you the open letter you ask, which would be giving something for nothing. What reason have you for thinking I should?

"Respectfully yours,

"JOHN CANFIELD."

Neither in the interview with Mr. Peters nor in the letter does he intimate that the contract has been abandoned or forfeited, but in a later interview with Mr. Peters he made the claim that Sweet had no interest under the contract that he could assign or sell, and refused to recognize any rights in Mr. Peters. On December 28, 1885, a tender was made by Mr. Peters to Mr. Canfield of $15,000 in gold, in payment of the balance owing by Sweet upon the contract, and offering to pay more, if more was due, and if the tender was more than was due he requested that the surplus should be returned to him. The tender was refused. It is proper to state that Mr. Peters testifies that in the mean time he called upon Mr. Canfield, and told him that he had come to pay the principal and interest, if he desired it, and requested him to make a statement, which he declined to do. With reference to the clause of the contract requiring assignments to be indorsed upon both duplicates, we will say, without passing upon the validity or effect to be given to such clause, that it is competent to waive it by parol, and, if verbal assent to an assignment is given, it is a waiver of such requirement. The decided weight of testimony is that Mr. Canfield did consent to the assignment by Sweet to Peters. Sweet testifies to it, and Peters testifies that, in his interview with Canfield next after the receipt of the letter, he asked him if he did not consent to Sweet's selling his interest to him

(Peters), and he said he did. He then asked him what he meant by that, and Canfield replied, "He didn't consider Sweet had any interest to sell."

It is claimed that there has been unreasonable delay in making the tender, and in bringing the suit, which ought to bar a right to a specific performance. There was unquestionably considerable delay, but we think it was excused,—

1. By the idea which Peters. entertained that Canfield was only bothering him. They were, and always had been, upon good terms since they knew or dealt with each other.

2. When finally Canfield refused to recognize that Peters had any interest under the contract, he refused to make or render any statement, so that Peters could determine the amount to tender.

3. It has not been pointed out to us that the delay has caused the least injury to Mr. Canfield, or embarrassed him at all in his dealings with the land.

It is difficult to see how mere delay could in any respect injure him. By the terms of the contract he has absolute control over the lands. He can sell either land or timber, as he chooses, and in the month of May, 1884, did sell by contract a portion of the lands to Luther, Wilson & Luther. Some reliance is also placed upon the fact that the sale to Peters was not made until after the note given by Sweet was barred by the statute of limitations. Aside from the fact that if the payments had been indorsed as received by Canfield the note was not barred by the statute, there is the fact that the contract itself contains the agreement to pay the purchase money, and it was under seal, and the right of action upon it would not be barred short of 10 years.

We think the record makes a case for a specific performance of the contract, and such was the decree in the court below. Both parties have appealed,—the complain-

ant, because he claims that he is entitled to a specific performance upon paying what is due and owing to defendant by Sweet upon the contract. In the assignment from Sweet to Peters, the assignee, after agreeing to pay Sweet $25,000, assumed and agreed to pay to defendant "the balance due from said Sweet to Canfield, amounting, as near as can be estimated, to $21,189.51, and interest from September 13, 1880;" and the circuit judge held that this amount was fixed by Sweet on the basis of the statement made by the defendant in February, 1881, which showed a little more than this sum; and he assumes that Peters was willing to pay this sum as part of the price agreed upon; and he held that Peters could not dispute that such amount was due upon the contract, and he decreed that Peters should pay this sum without interest within six days, as a condition to a delivery of a deed to him by defendant.

In this we think the court erred. The assignment will not bear that construction. Its language is too plain. He does not agree to pay the sum estimated, but the sum due. Now, in light of the admitted fact that the statement furnished by Canfield to Sweet in February, 1881, included an error of interest compounded twice to the amount of $16,202.75, the injustice of such construction is manifest. We do not think, however, that Mr. Peters can occupy any better position than his assignor, Mr. Sweet, would as to the amount due. We think the method of computation of interest recognized by them, aside from the errors contained therein, should be enforced against Mr. Peters. The interest will be computed at 10 per cent., compounded to September 12, 1880, on the sums owing to Mr. Canfield by Mr. Sweet. The receipts by Mr. Canfield will in the same manner be computed at 10 per cent. to the same date. The balance, with money paid for taxes, if any, will draw simple interest at 10 per

cent. to date of decree, and the receipts by Mr. Canfield after September 12, 1880, will be subject to the like rate of interest. Upon paying the balance found due by this method of computation within 60 days after the decree is settled and entered, conveyance shall be made by Mr. Canfield as prayed for in the bill. As modified above, the decree will be affirmed,—each party to pay one-half the costs of printing record for this Court, and clerk's fees. No other costs awarded.

The other Justices concurred.