CHRISTIAN *v.* MICHIGAN DEBENTURE CO.

DEBENTURE COMPANIES—LOTTERIES—FRAUD—EQUITY—PARTIES.

A corporation, organized in Ohio under the laws of West Virginia for the purpose of selling debentures, transferred its office to Michigan. Its authorized capital was $250,000, only a small part of which was ever paid in, though a large amount of stock was issued as fully paid. In order to enable the company to sell its debentures, its president deposited in a bank $50,000 to its credit, which was held out to investors as the property of the company, though deposited under a secret agreement with the officers of the company by which he agreed to guarantee a credit of $50,000 for one year. At the end of the year he attempted to withdraw $15,000 from the bank. The company falsely advertised that prominent men had bought debentures. After doing business eight months, it was refused the use of the mails, because its scheme was fraudulent and a lottery, and thereafter no new contracts were made. *Held:*

(1) That the transaction was fraudulent as to investors.

(2) That the debenture holders were jointly interested in preserving the funds of the company, and one or more of them might maintain a bill on behalf of themselves and all investors for that purpose, and to restrain the president from withdrawing the guaranty fund.

(3) That the bill could be maintained notwithstanding complainants' debentures were not due, as it appeared that the company was insolvent, and its scheme fraudulent and impossible of performance.

(4) That, complainants having acted in good faith, they would be protected in equity, though the debentures were illegal and a lottery.

(5) That the $50,000 deposited by the president, having been advertised with his knowledge to be the property of the company, should be held for the payment of debentures.

Appeal from Wayne; Donovan, J. Submitted April 8, 1903. (Docket No. 8.) Decided July 14, 1903.

Bill by Charles E. Christian and others against the Michigan Debenture Company and others for the appointment of a receiver and for an accounting. From a decree for complainants, defendants appeal. Affirmed.

September 8, 1899, the defendant the Michigan Debenture Company was organized at Columbus, Ohio, as a corporation under the laws of West Virginia, and filed its articles of association with the Secretary of State of West Virginia. The business of the corporation was the sale of what is termed "debentures," under a plan set forth in its prospectus and advertisements. October 14, 1899, its offices were transferred to Detroit, and it began business in the State of Michigan on or about that date. Its authorized capital was $250,000. On its organization, five shares of its capital stock, par value $100 per share, were subscribed for, and $50 was paid in. $147,700 of the capital stock was issued by the company as fully paid. Only $3,724 of its capital stock was ever paid in. This sum was later transferred to the expense fund of said company. Afterwards $2,000 was transferred from the expense fund

to the redemption fund, and $4,500 was transferred from the expense fund to the reserve fund. The entire cash capital of the company was thus wiped out, but was not dissipated, as these amounts were only transferred to other funds of the corporation. The remainder seems to have been issued and given to E. B. Harang in payment for the plan, etc., on which the company did business. On June 30, 1900, the Michigan Debenture Company, acting under the provisions of section 8587 of the Compiled Laws of Michigan, filed with the Secretary of State a certified copy of its articles of association, etc., paid the franchise fee, and was admitted to do business in this State.

In order to give the Michigan Debenture Company a commercial standing so it could sell its debentures, William A. Pungs, the president of the company, deposited $50,000 to its credit in the Preston National Bank. This fund was deposited in said bank under a secret written agreement between William A. Pungs and the Debenture Company, by which said Pungs agreed to guarantee a credit of $50,000 to the company; and in pursuance of that agreement the deposit was made, and the Preston National Bank issued to the Michigan Debenture Company a receipt for the same, as follows:

"Guarantee Fund.

"The Preston National Bank     Capital, $700,000.
     of Detroit, Mich.       October 17, 1899.

"Received of the Michigan Debenture Company fifty thousand dollars, which amount is held by this bank subject only for the payment of that amount of matured debentures issued by said the Michigan Debenture Company.

[Signed]     "Preston National Bank,
       "F. W. Hayes, President."

The $50,000 guaranty fund was held out to investors and others as part of the funds of the company. The Debenture Company, from time to time, advertised largely in the Detroit newspapers, and sent out a great many circulars and other advertising matter. These advertisements represented the debentures of the company to be a

guaranteed investment of at least 8 per cent., protected by a $50,000 guaranty fund in the Preston National Bank. Defendant Pungs knew of these advertisements, and knew that these complainants and others were buying the company's debentures, believing the $50,000 guaranty fund belonged to the company. Several of the complainants testified to these representations, and that they in good faith purchased the debentures, relying upon them. From time to time lists of names of those investing with the company, including the names of many prominent citizens, with a statement of amounts paid in and received by them, were published by the company, for the purpose of getting business. Of these, three of the most prominent never paid in anything on the debentures of the company, and none of them ever received anything from the company. Defendant Pungs took out and paid for their debentures, and received all redemptions on such debentures. Defendant Pungs was the actual manager and head of the company from March, 1900, until this suit was brought. He was practically the only man who was financially interested in the company, or who had anything to gain by its operations.

In the fall of 1900 the company was denied the use of the United States mails because of lottery features in its debentures, and never sold any new contracts thereafter, but continued to collect dues and lapse contracts until this suit was brought. In December, 1900, the affairs of the company were examined by the State Banking Department, and the company found to be insolvent. When this suit was commenced, the company was insolvent, and its condition was steadily growing worse. From the time the company was denied the use of the mails, the income grew less and less each month, and a finishing point would finally have been reached. The receipts of the company were constantly decreasing, and the value of the remaining coupons, according to the schedule of redemption values issued by the company, was constantly increasing. If the business had been continued, the time would have

arrived when the so-called "guaranty fund" would have been insufficient to pay the matured debentures.

Under the written contract between the Debenture Company and defendant Pungs, he was to receive $5,000 from the company for the said guaranty fund of $50,000 for the first year. In fact he received $1,500 more, being 3 per cent. on the deposit paid by the bank. At the end of the first year, defendant Pungs attempted to withdraw $15,000 from the guaranty fund, but the Preston National Bank declined to allow him to do so. Thereupon the Debenture Company paid to defendant Pungs $15,000 from the reserve fund, and substituted $15,000 from the guaranty fund in its place. The company was insolvent at the time, yet the debenture holders were told that, unless they kept up their payments, their contracts would be lapsed. The company had no income except that received from lapses, and interest on its funds in bank.

Complainants are debenture holders, and filed this bill alleging fraudulent conduct on the part of Pungs and the officers and promoters of the defendant company, its insolvency, and its cessation of all business except to collect on existing debentures; that the business of the company is fraudulent, its debenture contracts impossible of performance, and that Pungs claims that the $35,000 on deposit with the defendant bank as the guaranty fund belongs to him. The bill pays for the appointment of a receiver; that complainants be relieved from any further payments on said debentures; that an accounting be had; that the complainants recover the amounts paid by them, less the amounts received by them from matured coupons; and that the transfer of the $15,000 to Pungs be declared void. The case was heard upon pleadings and proofs taken in open court, and decree rendered for complainants.

*Edwin F. Conely* and *Orla B. Taylor* (*Haug & Yerkes*, of counsel), for complainants.

*Barbour & Rexford*, for defendants.

GRANT, J. (*after stating the facts*). 1. Is fraud charged in the bill and proven by the evidence against the defendant Pungs and the other directors of said company? The bill sets forth fully the main facts above stated. It charges that the scheme was illegal, a mere lottery, and that the representations made by the defendant officers in their advertisements and literature were false and fraudulent. It sets forth all the circumstances under which Mr. Pungs furnished the $50,000, to be deposited and advertised as a guaranty fund belonging to the company, and that the arrangement between Pungs and the company was concealed. The bare statement of this arrangement stamps it as fraudulent. The United States government investigated the scheme, declared it fraudulent, and prohibited the company the use of the mails. The banking department of this State made a like investigation, and reached the same conclusion. The character of the scheme will in the main appear from an examination of the contract, printed at the end of this opinion. The allegation of fraud is sufficient. The proofs fully sustain the charge. The defendant directors advertised this guaranty fund as the property of the company. It published the receipt of the bank that it was received and held by the bank "only for the payment of that amount of matured debentures issued by said the Michigan Debenture Company." This was a grossly fraudulent representation, under the present claim of the defendants.

2. It is urged that the complainants are severally, and not jointly, interested, and therefore cannot maintain the bill as joint complainants. The bill is filed in behalf not only of the complainants, but of all the debenture holders. Complainants are jointly interested to prevent the dissipation of the funds in the treasury of the company, and in preventing Mr. Pungs from obtaining possession of the guaranty fund. Their interests are more closely connected than are taxpayers owning several distinct parcels of land, and who jointly file a bill to restrain the illegal appropriation of public funds or illegally contracting a debt. That

taxpayers may so join in a bill of complaint is well established. *George* v. *Electric Light Co.*, 105 Mich. 1 (62 N. W. 985). The reason for these debenture holders joining is more cogent.

3. It is next urged that these complainants cannot maintain the bill because these debentures have not matured. Upon being denied the use of the mails, the company ceased to do any business in this State other than to attempt collections from its then holders of debentures. It is apparent that, the more these holders paid, the worse off they would be. The company was insolvent, its scheme found to be fraudulent and impossible of performance. Its principal manager and promoter was its treasurer, and claimed its indemnity fund. Under these circumstances, the only security the debenture holders had was to stop further expense, and to recover from the company the money in its treasury so far as it would go towards paying back the money they had invested.

4. It is next contended that, if the scheme under which the debentures were sold is illegal and a lottery, equity will not give complainants relief. If complainants purchased these debentures with knowledge of their illegal and fraudulent character, both law and equity would leave them without remedy. If, on the contrary, they acted in good faith, and were honestly deceived by the representations of the defendant through its officers, and the representations were such as would naturally tend to deceive, they are entitled to relief. The published literature of the company covers many pages of the record, and is so worded that it would naturally deceive the ignorant and the unwary, and as well intelligent persons unfamiliar with business methods. Mr. Pungs secured the names of three prominent citizens of Detroit as purchasers of these debentures, and so advertised them. In fact, they invested no money, but Mr. Pungs himself paid all their dues, and, under a resolution of the directors authorizing a compromise, he at once took advantage of the resolution, and received the money which under it would go to these

three holders.   This is one of the methods very commonly resorted to to induce others to make investments in such corporations.   The scheme appeared plausible upon its face, and the representations made in the company's publications.   No moral turpitude attaches to the complainants.   The case falls within the following authorities: *Calkins* v. *Bump*, 120 Mich. 335 (79 N. W. 491); *State* v. *Investment Co.*, 64 Ohio St. 283 (60 N. E. 220, 52 L. R. A. 530, 83 Am. St. Rep. 754).

5. Even if Mr. Pungs were entirely innocent in making his contract for the deposit of the $50,000, as between him and the debenture holders, he must suffer the loss.   *Holcomb* v. *Noble*, 69 Mich. 396 (37 N. W. 497); *Peters* v. *Canfield*, 74 Mich. 498 (42 N. W. 125); *Condon* v. *Hughes*, 92 Mich. 367 (52 N. W. 638); *Stevens* v. *Ludlum*, 46 Minn. 160 (48 N. W. 771, 13 L. R. A. 270, 24 Am. St. Rep. 210). Mr. Pungs knew that this fund was advertised as the property of the company.   It was done for the purpose of inducing purchases.   It had the desired effect.   He is now estopped to claim title to any of this fund until the debenture holders have been made whole.

Decree affirmed.

The other Justices concurred.

CONTRACT.

UNITED STATES OF AMERICA.

Certificate No. ———.

THE MICHIGAN DEBENTURE COMPANY, INCORPORATED,
Authorized Capital Stock
    $250,000.00

DOES HEREBY AGREE

to pay to ——— or order, upon maturity or redemption of any of the hereto attached five coupons, a sum equal to all the payments made thereon, together with the respective share of the net surplus earnings as shown by schedule of redemption values.

The terms and conditions printed on the back hereof and in application herefor are a part of this contract as fully as if recited herein.

Signed, sealed, and delivered at Detroit, Mich., this ——— day of ———, 19—.

———————,
                                            President.

————,
    Secretary.

*Terms and Conditions.*

Payments on this debenture shall be five dollars membership fee for the first month, and thereafter an installment of fifty cents per month on each unredeemed coupon until redemption or maturity. The membership fee must accompany the application, and the monthly installments are due without notice at the main office, or some duly authorized depository, on the first day of each month, beginning with the first month after the date of this certificate. Failure to pay on or before the fifteenth day of the month any installment due hereon shall render this contract null and void, and forfeit all payments made on same; but the same may be reinstated at any time within thirty days from lapse, by payment of overdue installment and a fine of ten cents on each unredeemed coupon; but in no case shall the fine be less than twenty-five cents. No receipt for payment is valid unless it bears the signature of the secretary or some person acting upon his written authority, and all remittances are made at the sender's risk.

Apportionment of Receipts.—All money paid to the company on account of debentures (or coupons) shall be divided into three separate funds, which shall be designated and used as follows:

Reserve Fund.   This fund shall consist of twenty per cent. of all the monthly installments paid to the company by holders of its debentures, which, together with its interest increment, shall be invested in such securities as the board of directors may deem advisable.

Expense Fund.   This fund shall consist of the purchase price of all debentures (viz., five dollars on each debenture issued), together with fourteen per cent. of all subsequent installments received by the company on account of same; also of all fines, transfer fees, and other extraneous receipts.

Redemption Fund.   This fund shall consist of sixty-six per cent. of all the money collected by the company on account of monthly installments on outstanding debentures.   It shall be subdivided into two separate funds, designated, respectively, as a "Special Redemption Fund" and the "General Redemption Fund," each of which shall be applied monthly as collected to the redemption of coupons as hereinafter specified.

Special Redemption.   Each month sixteen per cent. of the total redemption fund for that month shall be used as a special redemption fund for that month, to be applied as follows:   The lowest numbered coupon of the lowest numbered debenture shall be redeemed; then the lowest numbered coupon of the next debenture in order, and so on through the list until said fund is disbursed.

General Redemption.   Each month eighty-four per cent. of the total redemption fund for that month shall be used as a general redemption fund, to be applied as follows:   The coupons to be redeemed each month with this fund are scattered throughout the entire list of coupons eligible for redemption, and cannot be designated in advance of the disbursement of the special redemption fund, nor until the calculation (hereinafter described) has been made for the purpose of determining the number of coupons that must be alternately passed over in the course of redemption.   After the number which must intervene between the coupons to be redeemed has been determined as aforesaid, and the special redemption for that month has been concluded, a starting point for the general redemption is given by first redeeming the lowest numbered

coupon attached to the debenture next following the last one from which a coupon was redeemed by the special redemption; and then, passing over as many consecutive coupons (of those eligible for redemption) as are equal to the "Redemption Numeral," redeem another, and so on in like order until the fund is disbursed.

Redemption shall occur regularly on the 25th day of each month; but whenever the 25th shall fall on Sunday or other legal holiday, the redemption shall occur on the next legal day following.

The numeral apart which shall elect the coupons to be redeemed must be determined by dividing the total number of eligible coupons by the number the amount will pay on basis of the average value of such coupons.

The redemption numeral may be changed by order of the board of directors to any fractional part of the numeral obtained by the foregoing calculation.

Surrender Value.—At any time after thirty-six months from date hereof, provided all payments of installments have been made as same became due and payable, the holder of this debenture may, if he so desires, surrender same to the company, and receive therefor a paid-up certificate for the total sum paid on account of this debenture to that date (less the amount received by the company on account of coupons previously redeemed), together with eight per cent. per annum for the average time; this accrued interest to be added to the principal of the paid-up certificate. All such paid-up certificates will be paid by the company in the order in which the applications for same are filed, and shall bear interest at eight per cent. per annum until paid. For this purpose an amount not exceeding five per cent. of the general redemption fund for any one month may be used.

Agent's Authority.—No person has power to alter, waive, or modify in any way the terms and conditions of this contract, and no promises or conditions other than those contained herein shall be binding upon the company.

Transfer.—This debenture is transferable only on the books of the company, for which a fee of twenty cents for each unredeemed coupon is charged; but in no case will the fee be less than fifty cents.

Eligibility and Maturity.—This certificate shall not be eligible for redemption until one monthly payment shall have been made hereon, and will be deemed fully matured at expiration of seventy-two months from date hereof. The money necessary to pay off said matured debentures shall be drawn from the redemption fund most immediately available, and, should that amount be insufficient for the purpose, then the balance shall be drawn from the reserve fund.